UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| BW ORCHARDS, LLC, C & D,<br>FUEHRING FARMS, INC., GOLDEN<br>HART FRUIT FARMS, LLC, GREEN<br>VENTURES, LLC, HERRYGERS<br>FARMS, LLC, JAMES JENSEN d/b/a/<br>JENSEN FARMS, LAKESHORE FARMS,<br>INC., LK VANSICKLE FARMS, LLC,<br>MALBURG ACRES LLC, RANDY A. FEDO<br>d/b/a RAN-MARK CO., PAUL OOMEN d/b/a<br>PAUL OOMEN & SONS, SLOCUM<br>FARMS, LLC, VILLADSEN TREE FARMS,<br>INC. and PRODUCE PAY, INC. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) Case No. _2:19-cv-7_____ |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| SPIECH FARMS GEORGIA, LLC, and<br>TIMOTHY M. SPIECH, BRADLEY A.<br>SPIECH, ROBIN L. SPEICH,<br>STEVEN M. SPIECH, and<br>EVA M. STONE, individually, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**COMPLAINT**

For its Complaint, the Plaintiffs, BW Orchards, LLC, C & D Fuehring Farms, Inc., Golden

Hart Fruit Farms, LLC, Green Ventures, LLC, Herrygers Farms, LLC, James Jensen d/b/a Jensen

Farms, Lakeshore Farms, Inc., LK VanSickle Farms, LLC, Malburg Acres, LLC, Randy A. Fedo

d/b/a Ran-Mark Company, Paul Oomen d/b/a Paul Oomen & Sons, Slocum Farms, LLC, Villadsen

Tree Farms, Inc., and Produce Pay, Inc. respectfully state as follows:

**THE PARTIES**

1.      Plaintiff BW Orchards, LLC ("*BW Orchards*") is a Michigan limited liability

company with an address of 1556 N. 56th Ave. Mears, Michigan 49436.

2.    Plaintiff C & D Fuehring Farms, Inc. ("*Fuehring Farms*") is a Michigan corporation with an address of 5109 W. Taylor Road, Mears, Michigan 49436.

3.    Plaintiff Golden Hart Fruit Farms, LLC, ("*Golden Hart*") is a Michigan Limited Liability Company with an address of 4054 W. Taylor Road, Hart, Michigan 49420.

4.    Plaintiff Green Ventures, LLC ("*Green Ventures*") is a Michigan Limited Liability Company with an address of 3308 W. Monroe Rd. Hart, Michigan 49420.

5.    Plaintiff Herrygers Farms, LLC ("*Herrygers Farms*") is a Michigan Limited Liability Company with an address of 1261 N. 136th Ave. Hart, Michigan 49420.

6.    Plaintiff James Jensen d/b/a Jensen Farms ("*Jensen Farms*") is a Michigan sole proprietorship with an address of 454 W. Tyler Rd. Hart, Michigan 49420.

7.    Plaintiff Lakeshore Farms, Inc. ("*Lakeshore Farms*") is a Michigan corporation with an address of 1747 S. 32nd Ave. Shelby, Michigan, 49455.

8.    Plaintiff LK VanSickle Farms, LLC ("*Vansickle Farms*") is a Michigan Limited Liability Company with an address of 2491 E. Polk Rd. Hart, Michigan 49420.

9.    Plaintiff Malburg Acres, LLC ("*Malburg Acres*") is a Michigan Limited Liability Company with an address of 1107 W. Jackson Rd. Hart, Michigan 49420.

10.    Plaintiff Randy A. Fedo d/b/a Ran-Mark Company ("*Ran-Mark*") is a Michigan sole proprietorship with an address of 2978 E. Hazel Rd. Hart, Michigan 49420.

11.    Plaintiff Paul Oomen d/b/a Paul Oomen & Sons ("*Paul Oomen*") is a Michigan sole proprietorship with an address of 2480 East Hammett Road, Hart Michigan 49420.

12.    Plaintiff Slocum Farms, LLC, ("*Slocum Farms*") is a Michigan Limited Liability Company with an address of 1625 N. 136th Ave. Hart, Michigan 49420. Slocum Farms sells wholesale quantities of perishable agricultural commodities ("*Produce*") in interstate commerce

and operates its business under a valid United States Department of Agriculture ("*USDA*") issued PACA license, identified as License No. 20121448.

13.   Plaintiff Villadsen Tree Farms, Inc., ("*Villadsen Farms*") is a Michigan corporation with an address of 2184 W. Jefferson Rd. Pentwater, Michigan 49449.

14.   BW Orchards, Fuehring Farms, Golden Hart, Green Ventures, Herrygers Farms, Jensen Farms, Lakeshore Farms, VanSickle Farms, Malburg Acres, Ran-Mark, Paul Oomen, Slocum Farms, and Villdasen Farms are collectively hereinafter referred to as the "*Growers*."

15.   At all times relevant hereto, Growers were in the business of raising Produce, specifically asparagus,  for marketing and, therefore, are "growers" as defined by PACA.

16.   Plaintiff Produce Pay, Inc., ("*Produce Pay*") is a Delaware corporation with its principal place of business located at 445 South Figueroa Street, Suite 2580, Los Angeles, California 90071.

17.   Produce Pay buys and sells wholesale quantities of Produce in both interstate and foreign commerce.

18.   At all times relative hereto, Produce Pay operated its business under a valid USDA issued PACA license, identified as license number 20150951. A true and correct copy of Produce Pay's PACA License is attached hereto as *Exhibit A*.

19.   At all times relevant hereto, Produce Pay was engaged, directly or indirectly, in the business of purchasing and/or selling Produce in wholesale or jobbing quantities and, therefore, is a "dealer" Produce as defined by PACA.

20.   Growers and Produce Pay are collectively hereinafter referred to as "*Plaintiffs*."

21.   The Defendants are:

a.  Spiech Farms Georgia, LLC ("*Spiech Georgia*"), a Georgia Limited Liability Company with its principal places of business in Baxley and Brunswick, Georgia. At all times relevant to this action, Spiech Georgia:

   i.  operated, conducted, and otherwise was engaged in or carried on the business, in whole or in part, of its direct or indirect parent company, Spiech Farms, LLC ("*Spiech Michigan*")[1], a Michigan Limited Liability Company with its principal place of business in Paw Paw, Michigan, by whom Spiech Georgia is wholly owned;

   ii.  operated, conducted, and otherwise carried on business as a grower, buyer, and seller of Produce under the direct dominion and control of Spiech Michigan and its officers, directors, members, and controlling persons;

   iii.  operated farms and facilities and does business consisting of growing, packing, and shipping Produce in Baxley and Brunswick, Georgia;

   iv.  transacted business with farmers, agricultural supply companies, and other business entities within the state of Georgia;

   v.  acted as grantor and provided Bank of Holland a blanket security interest in and to all of its assets as collateral for a loan issued to Spiech Michigan, Timothy M. Spiech, Steven M. Spiech, and Robin L. Spiech.

---

[1] Spiech Michigan filed for protection under chapter 11 of the United States Code on November 22, 2017, and the action is currently proceeding under the caption *In re: Spiech Farms, LLC* in the United States Bankruptcy Court in the Western District of Michigan, Case Number 17-05398 with the Honorable John T. Gregg presiding. In light of the bankruptcy proceeding, none of the causes of action or prayers for relief herein are claimed against Spiech Michigan. Thus, this action does not violate the automatic stay pursuant to 11 U.S.C. § 362(a).

A true and correct copy of the relevant Agricultural Security Agreement is attached hereto as *Exhibit B;*

vi. utilizes the same logo, labeling, and other identification in connection with the sale and marketing of its product as Spiech Michigan;

vii. is not separately capitalized from Spiech Michigan, and utilizes the same banking and credit accounts as Spiech Michigan;

viii. received, accepted, and processed blueberries from growers in Georgia and Florida related to contracts wherein Spiech Michigan served as direct purchaser;

ix. owned and utilized residential and commercial property located in Appling County, Georgia for its ongoing business operations (e.g. employee housing, farming, packing, etc). True and correct copies of records showing ownership and interest in properties located in Appling County and Brantley County including reports from qPublic.net and a UCC filing pertaining to the property are attached hereto as *Exhibit C;*

x. utilized residential and commercial property located within the state of Georgia, which was owned by Spiech Michigan, Timothy M. Spiech, Bradley A. Spiech, Robin L. Spiech, and Steven M. Spiech for its ongoing business operations (e.g. employee housing, farming, packing, etc). *See Exhibits B* and *C.* True and correct copies of documents showing ownership and interest in property located in Appling County Georgia is attached hereto as *Exhibit D.*

       xi.   was directed, supervised, managed, and controlled by Spiech Michigan and its officers and members, including but not limited to Timothy M. Spiech, Bradley A. Spiech, Robin L. Spiech, Steven M. Spiech, and Eve M. Stone. *See Exhibit B*. True and correct copies of Spiech Georgia's Secretary of State filings are attached hereto as *Exhibit E*.

       xii.   derives a substantial portion of its revenue from the produce grown on its farms in Georgia as well as harvesting and packing services rendered at its facilities located within the state of Georgia;

b.   Timothy M. Spiech ("*Tim*"), a Michigan resident, with additional real estate holdings within the state of Georgia, is a manager, member, officer, director, or otherwise an agent of both Spiech Michigan and Spiech Georgia and exercised direct dominion and control over both Spiech Michigan and Spiech Georgia's financial and business affairs at all times relevant to this action. *See Exhibit B* and *E*. Furthermore, at all times relevant hereto, Tim:

       i.   served as "Chief Operations Officer" and twenty-five percent (25%) owner of Spiech Michigan, which includes equal ownership in Spiech Georgia. *See Exhibit E*;

       ii.   served as a "Member" of Spiech Georgia. See *Exhibits B* and *E*;

       iii.   negotiated and executed the Distribution Agreement between Spiech Michigan and Produce Pay. A true and correct copy of the Distribution Agreement is attached hereto and incorporated herein as *Exhibit F*.

      iv.  was listed as a Principal on Spiech Michigan's PACA license. A true and correct copy of Spiech Michigan's PACA license is attached hereto as *Exhibit G*;

      v.  co-signed and individually guaranteed multiple loan and mortgage documents on behalf of Spiech Georgia. *See Exhibit B*;

      vi.  owned or possessed both residential and commercial property located in the state of Georgia that Spiech Georgia and its members utilized in connection with the ongoing operation of Spiech Georgia (e.g. employee housing, farming, packing, etc.). *See Exhibits C and D*;

      vii.  derives a substantial portion of his personal revenue from the operations of Spiech Georgia, and Spiech Georgia's utilization of his personally owned real estate holdings within the state of Georgia;

      viii.  committed or otherwise participated in the commission of certain tortious acts, omissions, and other wrongs within the state of Georgia as set forth herein;

      ix.  committed or otherwise participated in the commission of certain tortious injuries caused by acts or omissions committed outside the state of Georgia as set forth herein;

      x.  conspired with others to commit and participated in certain tortious acts, injuries, and other wrongs within and outside the state of Georgia as set forth herein.

c.  Bradley A. Spiech ("*Bradley*"), a Michigan resident, with an additional home in Baxley, GA, is a manger, member, and/or officer of both Spiech Michigan

and Spiech Georgia, and was in a position to exercise dominion and control over both Spiech Michigan and Spiech Georgia's financial and business affairs at all times relevant to this action. *See Exhibit E.* Furthermore, at all times relevant hereto, Bradley:

i. served as twenty-five percent (25%) owner of Spiech Michigan, which includes equal ownership in Spiech Georgia. *See Exhibit E;*

ii. was listed as a Principal on Spiech Michigan's PACA license. *See Exhibit G;*

iii. owned and possessed residential property located in Baxley, Georgia that Spiech Georgia and its members utilized in connection with the ongoing operation of Spiech Georgia (e.g. employee housing, farming, packing, etc.). *See Exhibit C and D;*

iv. on information and belief[2], owned and possessed commercial property in the state of Georgia that Spiech Georgia and its members utilized in connection with the ongoing operation of Spiech Georgia (e.g. employee housing, farming, packing, etc.). *See Exhibits C and D;*

---

[2] On or upon "information and belief," as used herein, means Plaintiff is informed and believes a fact or condition to be true and, upon such information and belief, alleges the fact or condition in connection with the instant complaint. Plaintiff's information and beliefs are based upon investigation and derived from such sources as: Plaintiff's conversations with Defendants, e-mail correspondence with Defendants, publicly available government documents, relevant statements or information contained on Defendant owned or controlled websites, Plaintiff's communications with Defendants, Plaintiff and Defendants relevant produce transaction documents, documents Defendants uploaded to and otherwise provided Plaintiff, and relevant third party documents, as well as records filed on the docket as public record in the *Spiech Farms, LLC* Bankruptcy case including testimony recorded in the transcripts of hearings on January 4, 2018 [D.E. # 170], January 31, 2018 [D.E. # 325], February 1, 2018 [D.E. # 177], and September, 24, 2018, the transcripts of the Depositions of Joan Johnson [D.E. # 103], Tim Spiech [D.E. # 104], Eve Stone [D.E. # 105], and documents obtained as a result of initial disclosures and discovery conducted during the bankruptcy proceeding.

     v.  derives a substantial portion of his personal revenue from the operations of Spiech Georgia, and Spiech Georgia's utilization of his personally owned real estate holdings within the state of Georgia;

     vi.  committed or otherwise participated in the commission of certain tortious acts, omissions, and other wrongs within the state of Georgia as set forth herein;

     vii.  committed or otherwise participated in the commission of certain tortious injuries caused by acts or omissions committed outside the state of Georgia as set forth herein;

     viii.  conspired with others to commit and participated in certain tortious acts, injuries, and other wrongs within and outside the state of Georgia as set forth herein.

d.  Robin L. Spiech ("*Robin*"), a Florida resident, with additional real estate holdings within the state of Georgia, is a manager, member, and/or officer of both Spiech Michigan and Spiech Georgia, and was in a position to exercise dominion and control over Spiech Michigan and Spiech Georgia's financial and business affairs at all times relevant to this action. *See Exhibits B and E.* Furthermore, at all times relevant hereto, Robin:

     i.  served as twenty-five percent (25%) owner of Spiech Michigan, which includes equal ownership in Spiech Georgia. *See Exhibit E*;

     ii.  served as a "Member" of Spiech Georgia. See *Exhibit B* and *E;*

     iii.  was listed as a Principal on Spiech Michigan's PACA license. *See Exhibit G*;

iv. co-signed and individually guaranteed multiple loan and mortgage documents on behalf of Spiech Georgia. *See Exhibit B;*

v. possessed both residential and commercial property located within the state of Georgia that Spiech Georgia and its members utilized in connection with the ongoing operation of Spiech Georgia (e.g. employee housing, farming, packing, etc.). *See Exhibit C;*

vi. derives a substantial portion of her personal revenue from the operations of Spiech Georgia, and Spiech Georgia's utilization of real estate located within the state of Georgia that Robin co-signed for or otherwise personally guaranteed;

vii. committed or otherwise participated in the commission of certain tortious acts, omissions, and other wrongs within the state of Georgia as set forth herein;

viii. committed or otherwise participated in the commission of certain tortious injuries caused by acts or omissions committed outside the state of Georgia as set forth herein;

ix. conspired with others to commit and participated in certain tortious acts, injuries, and other wrongs within and outside the state of Georgia as set forth herein.

e. Steven M. Spiech ("*Steve*"), a Florida resident, with personal real estate holdings within the state of Georgia, is a manager, member, and/or officer of both Spiech Michigan and Spiech Georgia, was in a position to exercise dominion and control over Spiech Michigan and Spiech Georgia's financial and

business affairs at all times relevant to this action. Furthermore, at all times relevant hereto, Steve:

i.   served as "President" and twenty-five percent (25%) owner of Spiech Michigan, which includes equal ownership in Spiech Georgia. *See Exhibit E*;

ii.  served as a "Member" of both Spiech Michigan and Spiech Georgia. *See Exhibit B;*

iii. was listed as a Principal on Spiech Michigan's PACA license. *See Exhibit G;*

iv.  co-signed multiple loan and mortgage documents on behalf of Spiech Michigan and Spiech Georgia. *See Exhibit B*;

v.   is the sole beneficiary of the insurance policies covering much of the farmland and packing facilities located within the state of Georgia utilized by Spiech Georgia in connection with its ongoing operations;

vi.  derives a substantial portion of his personal revenue from the operations of Spiech Georgia, and Spiech Georgia's utilization of real estate located within the state of Georgia that Steve co-signed or otherwise personally guaranteed;

vii. committed or otherwise participated in the commission of certain tortious acts, omissions, and other wrongs within the state of Georgia as set forth herein;

    viii.   committed or otherwise participated in the commission of certain tortious injuries caused by acts or omissions committed outside the state of Georgia as set forth herein;

    ix.   conspired with others to commit and participated in certain tortious acts, injuries, and other wrongs within and outside the state of Georgia as set forth herein.

f.   Eva M. Stone ("*Eve*"), a Michigan resident is a manager and/or officer of both Spiech Michigan and Spiech Georgia, and was in a position to exercise dominion and control over Spiech Michigan and Spiech Georgia's financial and business affairs at all times relevant to this action. Furthermore, at all times relevant hereto, Eve:

    i.   served as the "Controller" of Spiech Michigan and Spiech Georgia and, as such, was either in control or in a position to control the financial dealings of Spiech Michigan and Spiech Georgia. *See* Excerpt from Testimony of Eve Stone, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 5:13-6:4, Jan. 31, 2018 attached hereto as *Exhibit H*;

    ii.   is identified as an authorized signatory on Spiech Michigan and Spiech Georgia's annual registration documents on file with the Georgia Secretary of State, which authorizes Eve to sign documents and otherwise legally bind Spiech Georgia. *See Exhibit E*;

    iii.   on information and belief, was an authorized signatory on Spiech Georgia's bank and credit accounts. A true and correct copy of the

relevant portions of Defendants' credit card statements showing investments in Spiech Georgia is attached hereto as *Exhibit I*;

iv. derives a substantial portion of her personal revenue from the operations of Spiech Georgia and the financial services she provides to Spiech Georgia;

v. committed or otherwise participated in the commission of certain tortious acts, omissions, and other wrongs within the state of Georgia as set forth herein;

vi. committed or otherwise participated in the commission of certain tortious injuries caused by acts or omissions committed outside the state of Georgia as set forth herein;

vii. conspired with others to commit and participated in certain tortious acts and other wrongs within and outside the state of Georgia as set forth herein.

g. Tim, Bradley, Robin, Steve, and Eve are hereinafter collectively referred to as the "*Principals*." Spiech Georgia and the Principals are hereinafter collectively referred to as the "*Defendants*."

22. At all times relevant hereto, Spiech Georgia acted or failed to act by and through the Principals.

23. As a PACA licensee and dealer or broker of Produce, the acts omissions, or failures of its Principals, employees, or agents constitutes failures of Spiech Michigan and Spiech Georgia.

24. At all times relevant hereto, by virtue of its PACA license, Spiech Michigan was engaged, directly or indirectly, in the business of purchasing and/or selling Produce in wholesale

or jobbing quantities of Produce and, therefore, was and is a "dealer" of Produce as defined by the Perishable Agricultural Commodities Act, 1930, as amended, 7 U.S.C. §§499a-499t (the "*PACA*").

## JURISDICTION AND VENUE

25.     The Court has jurisdiction over this civil action arising under § 5(b) of the PACA, 7 U.S.C. § 499e(b)(2), pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367(a).  The Court has in rem jurisdiction over Plaintiffs' claims pursuant to, *inter alia*, 28 U.S.C. § 1655.

26.     The District Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1337 because PACA qualifies as an "Act of Congress regulating commerce" and several of Plaintiffs' claims herein arise under 7 U.S.C. § 499b and 7 C.F.R. § 46 *et seq*.

27.     The Southern District of Georgia possesses personal jurisdiction over the Defendants, pursuant to O.C.G.A. § 9-10-91, because at all times relevant hereto:

    a.  each of the Principals served as an owner, member, manager, and/or officer of Spiech Georgia, which transacts its Produce growing, harvesting, and packing business in Appling County and Glynn County, Georgia;

    b.  Tim Spiech, Bradley Spiech, Robin Spiech, and Steve Spiech own, possess, and/or utilize real estate located in Appling County and Glynn County, Georgia in connection with the operations of Spiech Georgia (e.g. employee housing, farming, packing, etc.); and

    c.  each of the Principals derives a substantial portion of his or her personal revenue from the operations of Spiech Georgia, and/or Spiech Georgia's utilization of personally held and/or personally guaranteed real estate located within the state of Georgia.

28. The Southern District of Georgia further possesses personal jurisdiction over the Defendants, pursuant to O.C.G.A. § 9-10-91, because at all times relevant hereto:

    a. each of the Defendants committed tortious acts and omissions within the state of Georgia;

    b. each of the Defendants committed tortious injuries in the state of Georgia caused by acts or omissions committed inside and outside of the state Georgia; and

    c. each of the Defendants conspired with the other Defendants to commit and participate in certain tortious acts, injuries, and other wrongs within and outside the state of Georgia as set forth herein.

29. Venue is proper in the Southern District of Georgia pursuant to 28 U.S.C. § 1391(b) and S.D. Ga. L.R. 2.1(a-b) because Tim Spiech, Bradley Spiech, Robin Spiech, and Steve Spiech own, possess, and/or utilize real estate within Appling County and Glynn County, Georgia in connection Spiech Georgia's operations (e.g. employee housing, farming, packing etc.).

30. Venue is proper in the Southern District of Georgia pursuant to 28 U.S.C. § 1391(b) and S.D. Ga. L.R. 2.1(c) because each of the Defendants committed a substantial part of the tortious acts and omissions complained of herein within Appling County and Glynn County Georgia by and through their involvement with the operations of Spiech Georgia and Spiech Georgia's utilization of real estate located within the Appling County and Glynn County Georgia.

31. Further, venue is proper in the Southern District of Georgia pursuant to 28 U.S.C. § 1391(b) and S.D. Ga. L.R. 2.1(d) because Spiech Georgia is a Georgia limited liability company which conducts a substantial amount of business and owns and/or utilizes employee housing,

farmland, and packing facilities located in Appling County and Glynn County, Georgia, which are both within the Brunswick Division of the Southern District of Georgia.

## FACTUAL ALLEGATIONS

### A. Spiech Michigan and Spiech Georgia

32. Principals used Spiech Michigan as a subterfuge to divert assets into Spiech Georgia, avoid paying debts, and defraud creditors such as Plaintiffs.

33. Principals disregarded the separate corporate identity of Spiech Georgia and Spiech Michigan when conducting their business affairs.

34. Spiech Georgia was simply an instrumentality for the transaction of Principals' affairs.

35. Spiech Michigan and Spiech Georgia share the same bank accounts, and funds are freely transferred between the two entities.

36. Spiech Georgia's corporate form has been disregarded so as to make it a mere sham or a business conduit for Principals to divert assets away from bankrupt Spiech Michigan.

37. All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals as one united entity in furtherance of the Principals' interests.

38. Spiech Georgia and Spiech Michigan's assets are completely dominated and controlled by Principals.

39. Spiech Georgia treated Spiech Michigan's property as its own, investing funds from the sale of asparagus into Spiech Georgia's blueberry operations. Further, the property, assets, and records of the two entities were commingled and not kept separate or apart.

40.     The Principals used Spiech Georgia as a vehicle for protecting themselves from, Spiech Michigan's impending financial failure.

41.     Instead of using the funds from sales of asparagus to pay Growers, Principals funneled the funds into Spiech Georgia, where they were used to fund blueberry growing operations, including fuel, equipment, supplies, labor, planting, harvesting, and other expenses and activities. *See Exhibit I.*

42.     In fact, Principals admitted that they spent funds that should have been used to pay Growers on the Spiech Georgia blueberry operations in their communications to Growers.[3]

43.     By funneling its assets into Spiech Georgia's blueberry operation, Principals enabled Spiech Michigan to avoid paying its creditors, such as Plaintiffs, and shield assets from Spiech Michigan's bankruptcy.

**B.  Growers' Produce Sales to Spiech Michigan**

44.     In or around May 2017, Growers and Spiech Michigan entered into multiple written or oral contracts under which Growers agreed to sell Produce, and Spiech Michigan agreed to purchase the Produce. True and correct copies of the written contracts are attached hereto as *Exhibit J.*

45.     Specifically, Growers agreed to sell and Spiech Michigan agreed to purchase fresh asparagus, which the USDA expressly recognizes as commodities covered under the provisions of the Perishable Agricultural Commodities Act, 1930, *as amended*, 7 U.S.C. §§ 499a-499t (2016) ("*PACA*").[4]

---

[3] Communications from Principals to Growers can be found in Exhibits *Y* through *CC*, identified and defined *infra* at ¶¶ 90 - 97.
[4] The USDA's Agricultural Marketing Service maintains and updates, in the ordinary course of its business, a complete list of the USDA's PACA covered commodities online at:
https://www.ams.usda.gov/sites/default/files/media/Commodities%20Covered%20by%20PACA.pdf.

46.     Additionally, Spiech Michigan agreed to act as the Growers' agent to market and sell Growers' Produce to third party purchasers. *See Exhibit J.*

47.     Golden Hart and Malburg Farms acted as a receiving station for Spiech Michigan, and Spiech Michigan received, hydro-cooled and graded all asparagus that was shipped to Spiech Michigan through Golden Hart and Malburg Farms.

48.     Spiech Michigan also used Malburg Farms' boxes to transport Produce from Malburg Farms' facilities to Spiech Michigan's packing plants.

49.     Spiech Michigan issued to Growers receiving forms reflecting the volume of Produce that Spiech Michigan accepted from Growers.

50.     Under its contracts with the Growers, Spiech Michigan agreed to pay the Growers based on a minimum price term subject to increase based on Spiech's actual sales of the Growers' Produce.

51.     BW Orchards sold to Spiech Michigan, and Spiech Michigan purchased from BW Orchards, Produce having an unpaid lot statement value in the present aggregate amount of $90,652.60. True and correct copies of the Lot Statements identifying the Produce BW Orchards sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit K.*

52.     Fuehring Farms sold to Spiech Michigan, and Spiech Michigan purchased from Fuehring Farms, Produce having an unpaid lot statement value in the present aggregate amount of $51,994.82. True and correct copies of the Lot Statements identifying the Produce Fuehring Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit L.*

53.     Golden Hart sold to Spiech Michigan, and Spiech Michigan purchased from Golden Hart, Produce having an unpaid lot statement value in the present aggregate amount of

$188,332.85. True and correct copies of the Lot Statements identifying the Produce Golden Hart sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit M*.

54.  Green Ventures sold to Spiech Michigan, and Spiech Michigan purchased from Green Ventures, Produce having an unpaid lot statement value in the present aggregate amount of $77,415.96. True and correct copies of the Lot Statements, Receiving Report, and Pallet Reports identifying the Produce Green Ventures sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit N*.

55.  Herrygers Farms sold to Spiech Michigan, and Spiech Michigan purchased from Herrygers Farms, Produce having an unpaid lot statement value in the present aggregate amount of $87,561.32. True and correct copies of the Lot Statement and Receiving Report identifying the Produce Herrygers Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit O*.

56.  Jensen Farms sold to Spiech Michigan, and Spiech Michigan purchased from Jensen Farms, Produce having an unpaid lot statement value in the present aggregate amount of $65,742.53. True and correct copies of the Receiving Report identifying the Produce Jensen Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit P*.

57.  Lakeshore Farms sold to Spiech Michigan, and Spiech Michigan purchased from Lakeshore Farms, Produce having an unpaid lot statement value in the present aggregate amount of $67,261.45. True and correct copies of the Lot Statements, Receiving Reports, and Pallet Report Summary identifying the Produce Lakeshore Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit Q*.

58.  Vansickle Farms sold to Spiech Michigan, and Spiech Michigan purchased from VanSickle Farms, Produce having an unpaid lot statement value in the present aggregate amount

of $66,756.61. True and correct copies of the Lot Statements, Receiving Reports, and Unpaid Invoice identifying the Produce VanSickle Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit R*.

59.     Malburg Acres sold to Spiech Michigan, and Spiech Michigan purchased from Malburg Acres, Produce having an unpaid lot statement value in the present aggregate amount of $101,214.95. True and correct copies of the Lot Statements, Receiving Reports, and Unpaid Invoices identifying the Produce Malburg Acres sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit S*.

60.     Ran-Mark sold to Spiech Michigan, and Spiech Michigan purchased from Ran-Mark, Produce having an unpaid lot statement value in the present aggregate amount of $287,173.79. True and correct copies of the Lot Statements, Receiving Reports, and Pallet Reports identifying the Produce Ran-Mark sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit T*.

61.     Paul Oomen sold to Spiech Michigan, and Spiech Michigan purchased from Paul Oomen, Produce having an unpaid lot statement value in the present aggregate amount of $106,344.11. True and correct copies of the Pallet Reports identifying the Produce Paul Oomen sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit U*.

62.     Slocum Farms sold to Spiech Michigan, and Spiech Michigan purchased from Slocum Farms, Produce having an unpaid lot statement value in the present aggregate amount of $77,171.82. True and correct copies of the Unpaid Invoices and Pallet Reports identifying the Produce Slocum Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit V*.

63. Villadsen Farms sold to Spiech Michigan, and Spiech Michigan purchased from Villadsen Farms, Produce having an unpaid lot statement value in the present aggregate amount of $20,775.49. True and correct copies of the Unpaid Invoices and Pallet Reports identifying the Produce Villadsen Farms sold to Spiech Michigan, and a chart summarizing the same is attached hereto as *Exhibit W*.

64. In aggregate, the Plaintiffs sold to Spiech Michigan, and Spiech Michigan purchased from Plaintiffs, Produce having an unpaid lot statement value of $1,288,398.31 as set forth in *Exhibits K* through *W*. A chart summarizing damages amounts for all Plaintiffs is attached hereto as *Exhibit X*.

65. Spiech Michigan accepted each load of Produce which corresponds to the load dates and numbers as listed in *Exhibits K* through *W*.

66. Spiech Michigan failed to object to or reject any of the Produce received from the Growers identified in *Exhibits K* through *W*.

67. Under the contracts, Spiech Michigan promised to pay Growers "the last week of May, June, and July." *See Exhibit J*.

68. Based on the contracts between Growers and Spiech Michigan, Growers delivered Produce to receiving farms such as Golden Hart, where the Produce was inspected and graded.

69. Under the contracts between Growers and Spiech Michigan, Growers were to be paid for all Produce Spiech Michigan received which met the requisite quality standards when inspected by the receiver.[5]

---

[5] The Quality Grade is defined in the contract between the parties as "[t]he grade based on, but not limited to poor quality (e.g. seediness, sizing), odor disease, and insect infestation **at the time of inspection upon arrival** to our facility." *See Exhibit J* (emphasis added).

70.     However, after harvest, Defendants changed the payment structure, without notice to or agreement from the Growers, so that they only intended to pay Growers for the Produce after the Produce was packed for sale, and that the price paid to the Growers would not be adjusted based on the actual sale.

71.     Because Growers were not properly notified of this change of policy, they continued to deliver Produce, expecting and relying upon the contractual terms that reflected payment based on the quality of their Produce.

72.     Further, Defendants changed the quality standards they used to determine payment to the Growers in the middle of the harvest season without notice to or agreement from the Growers.

73.     The contracts between Growers and Spiech Michigan contained a price term promising payment in the last week of June, July, and August of each season. *See Exhibit J.*

74.     In July of each season, Defendants agreed to send Growers regular lot statements showing the amount due from Spiech Michigan to Growers for Produce. *See Exhibit J.*

75.     However, as early as June 2017, Spiech Michigan stopped issuing regular lot statements to the Growers and, therefore, made it impossible for Growers to know how the quality of their Produce was graded or how much Spiech Michigan owed Growers.

76.     In September 2017, after harvest and delivery of the Produce had ended for the season, Defendants issued "revised lot statements" to Growers which announced in a "Loss Statement" that Spiech Michigan was "adjusting the Gross amount paid to all growers for the 2017 season by $.04/lb." The Loss Statement is stated on the Revised Lot Statements included in *Exhibits K, L, M, N, O, Q, R, S,* and *T.*

77.     The Revised Lot Statements were inconsistent with contractually agreed-upon prices and with the July statements. *See Exhibits J, K, L, M, N, O, Q, R, S, and T.*

78.     Under the contracts, Growers and Spiech Michigan agreed that Spiech Michigan was required to supply weekly statements to Growers. *See Exhibit J.*

79.     On information and belief, Defendants withheld such information from the Growers for the purpose of concealing the amount Spiech Michigan owed to the Growers.

80.     Under the contracts, Defendants agreed that Spiech Michigan would make weekly payments, to be issued about month after Produce was received by Spiech Michigan.[6]

81.     However, Spiech Michigan never once met its payment obligations to the Growers in a timely manner.

82.     Although Growers received a few payments, they were sporadic, partial, and late.

83.     Further, the distribution of payments between Growers appears to be arbitrary because they are not based on the contracts, the quality of the Produce, or any other discernable variable, resulting some Plaintiffs receiving respectively much lower payments for their Produce than others.

84.     From the due date of the first payment for Produce, Defendants made excuses and employed delay tactics to induce Growers to continue to deliver Produce while Spiech Michigan continued to fail to meet its payment obligations.

85.     Further, for Growers who agreed to price terms based on market price, Spiech Michigan's lot statements and accounting reflected market price calculations that were much lower than the market price returned by other packers in Spiech Michigan's area.

---

[6] The Produce was to be paid for, at the latest, 36 days after it was received.

86.     For Growers who agreed to price terms based on Spiech Michigan's actual sale of their Produce, Spiech Michigan's lot statements did not reflect any return to the Grower based upon actual sale.

87.     As such, the Growers are unpaid Produce suppliers having sold Produce to Defendants during 2017 for which they remain unpaid.

88.     Defendants failed to pay or otherwise deliver good funds to Growers in the amounts set forth under the "Total Amount Due" columns in *Exhibits K* through *W*, despite repeated demands from Plaintiffs.

89.     At all times relevant to the transactions at issue, Spiech Michigan and Spiech Georgia acted or failed to act by and through the Principals.

**C. Spiech Michigan's Proposed Payment Plans and Promissory Notes**

90.     In August 2017, by and through Steve Spiech, Defendants sent BW Orchards, Fuehring Farms, Herrygers Farms, Lakeshore Farms, VanSickle Farms, Slocum Farms and Villadsen Farms letters (the "*August Letters*") admitting its debt to Plaintiffs and the August 31, 2017 due date for that debt, and stating that Growers "will be paid in full during the 2017 fiscal year," and that "we will do our best to have you paid off by the end of September [2017]." True and correct copies of the August Letters to BW Orchards, Fuehring Farms, Herrygers Farms, Lakeshore Farms, Slocum Farms, Vansickle Farms and Villadsen Farms are attached hereto as *Exhibit Y*.

91.     Spiech Michigan also sent Green Ventures  and Jensen Farms a similar letter, admitting to its debt to Plaintiffs and the July 28, 2017 due date, and stating that Growers "will be paid in full during the 2017 fiscal year," and that "we will do our best to have you paid off by the

end of September [2017]." True and correct copies of the August Letters sent to Green Ventures and Jensen Farms are attached hereto as *Exhibit Z*.

92. Spiech Michigan also sent Plaintiff Malburg Acres a similar letter, admitting to its debt to Malburg Acres and the August 31, 2017 due date, and stating that Malburg Acres "will be paid in full during the 2017 fiscal year," and that "we will do our best to have you paid off by the end of November [2017]." A true and correct copy of the August letter sent to Malburg Acres is attached hereto as *Exhibit AA*.

93. Additionally, Spiech Michigan sent Plaintiff Ran-Mark a similar letter, admitting to its debt to Ran-Mark and the August 31, 2017 due date, and stating that Ran-Mark "will be paid in full during the 2017 fiscal year," and that "we will do our best to have you paid off by the end of December [2017]." A true and correct copy of the August letter sent to Ran-Mark is attached hereto as *Exhibit BB. Exhibits Y, Z, AA, and BB* are hereinafter collectively referred to as the "*August Letters.*"

94. Further, the August Letters addressed to BW Orchards, Fuehring Farms, Herrygers Farms, Lakeshore Farms, VanSickle Farms, Slocum Farms, Villadsen Farms, Malburg Acres, and Ran-Mark stated that "[w]e are imposing a 6% interest rate on ourselves as of August 31, 2017." *See Exhibits Y, AA, and BB*.

95. Additionally, the August Letters addressed to Green Ventures and Jensen Farms stated that "[w]e are imposing a 6% interest rate on ourselves as of July 28, 2017." *See Exhibit Z*.

96. Then, in October 2017, by and through Steve Spiech, Defendants sent BW Orchards, Fuehring Farms, Golden Hart, Green Ventures, Herrygers Farms, Lakeshore Farms, Malburg Acres, Paul Oomen, Slocum Farms, and VanSickle Farms a "Proposed Payment Plan" attached to a "Promissory Note." True and correct copies of the Promissory Notes and Proposed

Payment Plans Spiech Michigan issued to BW Orchards, Fuehring Farms, Golden Hart, Green Ventures, Lakeshore Farms, Malburg Acres, Paul Oomen, Slocum Farms, and VanSickle Farms are attached hereto and incorporated herein as *Exhibit CC*, respectively.

97.     The Proposed Payment Plan stated that Spiech Michigan would pay its debt to Growers "in full with a 6% APR imposed interest rate," over a period of three years. *See Exhibit CC.*

98.     The Proposed Payment Plan also stated that one of the reasons Spiech Michigan did not meet its contractual obligations to pay Growers by the end of 2017 was a "[d]evastating freeze in Georgia directly preceding the start of the blueberry harvest." *See Exhibit CC.*

99.     The Promissory Note reaffirmed Spiech Michigan's obligation to pay Growers for "value received," and promised to pay the sums owed "together with an annual interest rate percentage of 6%," in monthly payments beginning in June 2018 and ending in June 2020. *See Exhibit CC* (emphasis in original removed).

100.     According to the terms of the Promissory Notes, Spiech Michigan defaults if, among other reasons, it "files a bankruptcy petition or anyone files an involuntary bankruptcy petition against [it]" or if it "becomes insolvent and/or cannot pay [its] debts as they become due." *See Exhibit CC.*

101.     Further, the Promissory Note contains an acceleration clause allowing for immediate collection of the debt if Spiech Michigan defaults. *See Exhibit CC.*

102.     In the Promissory Note, Spiech Michigan agreed that its debt to Growers includes:

(i) the Principal amount; (ii) Note Interest; (iii) Default Interest; (iv) Late Charges, (v) Insufficient Funds Charges; (vi) Amounts owed as a consequence of a declared Event of Default and acceleration by [Growers]; and (vii) [Growers'] other costs and expenses of enforcing the Promissory Note including, but not limited to, attorneys' fees, and the costs of any arbitration proceeding to enforce the Note...

*See Exhibit CC.*

103.    Moreover, the Promissory Note states that "if at any time any payment . . . of the Guaranteed Debt is rescinded or must be restored or returned by [Growers] to Defendants upon the insolvency or bankruptcy of the Defendants or otherwise," the Promissory Note shall continue to be effective "as if such payments or services had not been made." *See Exhibit CC.*

104.    Additionally, the Promissory Note provides that "[n]o modification or waiver of the terms of the [Promissory Note] shall be allowed unless by written agreement signed by both parties," and that a waiver of "any breach or default" shall not be deemed a waiver of any following breaches or defaults. *See Exhibit CC.*

105.    Defendants failed to payments the Growers for any of the unpaid Produce identified in *Exhibits K* through *W*, as agreed under the Contracts, or as promised in the Promissory Notes and Payment Plans.

**D. Spiech Michigan's Contract with Produce Pay**

106.    On or about August 31, 2017, Spiech Michigan and Produce Pay entered into a written Distribution Agreement, under which Spiech Michigan agreed to sell and Produce Pay agreed to purchase certain Produce, specifically fresh grapes and fresh and frozen blueberries, both of which are PACA covered commodities, for the express purpose of Spiech Michigan selling such Produce to purchasers on commission on behalf of Produce Pay. *See Exhibit F.*

107.    Spiech Michigan, by and through Principal, Tim Spiech, acknowledged and agreed to the terms, conditions, representations, and warranties included in the Agreement by signing the Agreement and indicating his title as "Owner/COO." *See Exhibit F.*

108.    Pursuant to the Agreement, Spiech Michigan, under the direction, management, and control of the Principals, sold and transferred "all right, title, and interest" in Produce to Produce

Pay, and Produce Pay purchased and accepted all right, title, and interest in such Produce from Spiech Michigan, in a series of not less than thirty one (31) separate transactions in ton-lot quantities (i.e., each shipment of produce totaled or exceeded 2,000 pounds in weight). *See Exhibit F*, Part II, §3.2. True and correct copies of the Confirmations of Sale and related Pallet Reports identifying the Produce Spiech Michigan sold to Produce Pay, for the purpose of selling the Produce on Produce Pay's behalf, and a chart summarizing the same are attached hereto as *Exhibit DD*.

109.    Pursuant to the Agreement, Spiech Michigan, by and through Tim Spiech, registered each shipment of Produce with Produce Pay's online software Platform by uploading Pallet Reports identifying the Produce. *See Exhibit F*, Part II, §2.1 and *Exhibit DD*.

110.    By registering the Pallet Reports on the Platform, Spiech Michigan "certifie[d] that it ha[d] title to such [Produce] and [was] legally capable of transferring the title to" Produce Pay. *See Exhibit F*, Part II, §1(d) and §3.2(c).

111.    After Tim Spiech uploaded each Asset Pool to the Platform, Produce Pay evaluated and, relying on the representations and warranties Spiech Michigan made appurtenant thereto, digitally purchased the Produce identified on the uploaded pallet reports by paying an amount equal to fifty percent of the market value of the Produce. *See Exhibit F*, Part I and Part II, § 2.1.

112.    Produce Pay paid to Spiech Michigan the full agreed upon purchase price for all Produce identified on the Pallet Reports Tim Spiech uploaded to the Platform for a total of $501,136.85. *See Exhibit DD*.

113.    In connection with each transaction, Produce Pay issued and Spiech Michigan, by and through its Principals, received via the Platform, a billing statement, defined under the

Agreement as a "Confirmation of Sale," confirming Produce Pay's purchase of the corresponding Asset Pool identified on each uploaded Pallet Report. *See Exhibit DD.*

114.    Additionally, Produce Pay and Spiech Michigan agreed that as consignment agent for Produce Pay, Debtor would be responsible for paying:

> [R]easonable attorneys' fees and expenses as part of an action to collect on this invoice. Actual attorneys' fees incurred in bringing any action to collect on this invoice and/or enforcing any judgment granted and interest shall be considered as additional sums owed in connection with this transaction.

*See Exhibit F*, Part II, §2.1 and *Exhibit DD.*

115.    The contract language quoted in paragraph 114 above represents a material part of Produce Pay's standard credit terms and the Distribution Agreement.

116.    Defendants failed to object to Produce Pay's inclusion of the contract language quoted in paragraph 114 above as a material part of the parties' Distribution Agreement.

117.    Upon entering into the Distribution Agreement and accepting the Produce to sell on Produce Pay's behalf, Spiech Michigan retained no rights in and to the Produce it sold Produce Pay except the mere possessory right necessary to sell Produce Pay's Produce to third parties as Produce Pay's consignment agent. *See Exhibit F*, Part II, §3.2 and §4.2.

118.    Produce Pay and Spiech Michigan, by and through Tim Spiech, agreed that the payment terms between the parties required Spiech Michigan to remit Company Proceeds generated from Debtor's sale of Produce Pay's Produce, to Produce Pay within thirty (30) days. *See Exhibits F*, Part I and Part II, §1(f) and §6.1 and *Exhibit DD.*

119.    Pursuant to the Distribution Agreement, Spiech Michigan and Principals would only have the right to retain the remainder of the gross sale proceeds from its sale of Produce Pay's Produce to cover its related sales and marketing expenses upon, and not before, remittance of the full gross sale proceeds to Produce Pay.

120. Produce Pay and Spiech Michigan, by and through Tim Spiech, agreed that upon Spiech Michigan's failure to remit the gross sale proceeds to Produce Pay within the agreed upon thirty (30) day payment period, the amount the Spiech Michigan was entitled to retain would be subject to adjustment.

121. Specifically, on all shipments where Spiech Michigan failed to remit the gross sale proceeds to Produce Pay within 30 days, Produce Pay would retain an additional percentage of the gross sale proceeds at a rate of 0.042% per day (e.g., Number of days past due x 0.042% = additional percentage retained by Produce Pay). *See Exhibit F*, Part II, §6.2(b).

122. As Produce Pay's consignment agent, which was effective August 31, 2017, and under the direction, management, and control of Principals, Spiech Michigan sold all of Produce Pay's Produce identified on the Pallet Reports to its customers in multiple states between September 3, 2017 and October 19, 2017, as a consignment agent for Produce Pay, and generated invoices to its customers in the aggregate amount of $1,002,273.70. *See Exhibit DD.*

123. Contrary to the terms of the Distribution Agreement, under the direction, management, and control of Principals, Spiech Michigan collected the gross sale proceeds from its sale of Produce Pay's Produce to its customers and subsequently failed to remit any of the collected funds to Produce Pay.

124. Spiech Michigan, under the direction, management, and control of Principals failed to remit the full gross sale proceeds to Produce Pay, and consequently, the amount that Spiech Michigan and Principals are entitled to retain continues to decrease and other costs and expenses chargeable against Spiech Michigan under the Distribution Agreement continue to increase.

125. Defendants currently owe Produce Pay the full value of the gross sale proceeds in the current total aggregate amount of $1,275,961.10. *See Exhibit DD.*

## COUNT I
## PACA SECTION 2 VIOLATION:  FAILURE TO PAY PROMPTLY
## PRINCIPALS

126.   The Plaintiffs re-allege paragraphs 1 through 24 and 32 through 125 as though fully set forth herein.

127.   At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

128.   At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

129.   At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control Spiech Michigan's financial dealings. *See Exhibits B, E, H,* and *I.*

130.   At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

131.   As a PACA licensee, grower's agent, consignment agent, dealer, or broker of Produce, Spiech Michigan, Spiech Georgia, and the Principals possessed a statutory duty to promptly pay Plaintiffs for any and all Produce transactions.

132.   Throughout the sales period, Spiech Michigan received and accepted each of the shipments of Produce from the Plaintiffs identified in *Exhibits K* through *W* and *DD.*

133.   Under their agreements with the Growers, the Defendants were required to pay the Growers for each shipment of Produce within thirty (30) days of Spiech Michigan's receipt and acceptance of the Grower's Produce. *See Exhibit J.*

134. Under their Distribution Agreement with Produce Pay, Defendants were also required to remit the proceeds collected from the sale of Produce Pay's Produce within thirty (30) days of Spiech Michigan's sale of Produce Pay's Produce. *See Exhibit F*, Part I.

135. Defendants failed to pay for the Produce they received from growers identified in *Exhibits K* through *W*.

136. Defendants also failed to remit payment to Produce Pay for the Produce identified in *Exhibit DD*.

137. At all times relevant hereto, Spiech Michigan lacked the ability to pay its creditors in the ordinary course of business and was insolvent.

138. Tim Spiech admitted that the viability of Spiech Michigan in 2018 depended on the success of Spiech Georgia. *See* Excerpt from Testimony of Tim Spiech, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 184:12-18, Jan. 4, 2018 attached hereto as *Exhibit EE*.

139. The Principals, as owners, directors, managers, members, and shareholders of Spiech Michigan, failed to cause Spiech Michigan to pay the Plaintiffs within the applicable payment terms that were in effect between the parties at the time of each transaction.

140. The matters and actions alleged in this Count I constitute a violation by the Defendants of Section 2 of the PACA.

141. Defendants currently owe Plaintiffs an aggregate amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

142. As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

## COUNT II
## PACA SECTION 2 VIOLATION:
## <u>MAKING FALSE OR MISLEADING STATEMENTS</u>
## PRINCIPALS

143.    The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, and 126 through 142 as though fully set forth herein.

144.    At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

145.    At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

146.    At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control financial dealings. *See Exhibits B, E, H,* and *I.*

147.    As the Principals of a PACA licensee, grower's agent, consignment agent, dealer, and broker of Produce, Principals possessed a statutory duty not to make, for a fraudulent purpose, any false or misleading statement to Plaintiffs in connection with any and all Produce transactions between the Parties.

148.    At all times, Spiech Michigan and Spiech Georgia acted or failed to act through the Principals.

149.    Principals made several false statements regarding promises to pay Growers for the Produce transactions at issue herein.

150.    Principals failed to pay the Growers for any of the Produce identified in *Exhibits K* through *W* within the payment terms agreed upon by the Parties.

151.    Even before the first payment came due to the Growers on August 31, 2017, Principals began making oral and written promises that they would pay the Plaintiffs in full for the Produce Spiech Michigan received from them. *See Exhibits Y though BB.*

152.    Beginning in August, Defendants, by and through Principal Steve Spiech, issued the August Letters to BW Orchards, Fuehring Farms, Green Ventures, Herrygers Farms, Jensen Farms, Lakeshore Farms, Malburg Acres, Ran-Mark, Slocum Farms, VanSickle Farms, and Villadsen Farms promising to pay the Growers in full for each of the Produce transactions before the end of the 2017 fiscal year and promising to impose a 6% interest rate on themselves. *See Exhibits Y though BB.*

153.    Principals failed to make payment to any of these Growers or cause Spiech Michigan to make any payment to the Growers, after issuing the August Letters.

154.    On information and belief, Principals never intended to pay these Growers, but, instead, issued the letters for the fraudulent purpose of creating the false impression that it possessed the ability to pay, to buy time until Principals could file for Spiech Michigan's bankruptcy, induce the Growers to refrain from taking any action to collect the debt owed to them, and to induce the Plaintiffs to continue to sell Produce to Spiech Michigan.

155.    Subsequently, Principals, by and through Steve Spiech, issued Promissory Notes with incorporated Payment Plans to BW Orchards, Fuehring Farms, Golden Hart, Green Ventures, Herrygers Farms, Lakeshore Farms, Malburg Acres, Paul Oomen, Slocum Farms, and VanSickle Farms again promising to pay the Growers in full for their Produce, but delaying the start of payment into 2018 and promising to make monthly payments through 2020. *See Exhibit CC.*

156.    Principals assured the Growers in the Payment Plan that Spiech Michigan was profitable in 2017, which Principals knew was false and misleading because a little over a month

later, on November 22, 2017, Spiech Michigan filed for protection under Chapter 11 of the United States Bankruptcy Code.

157.    Principals also assured the Plaintiffs in the Promissory Notes that Growers would be entitled to interest and all costs of collection, including attorney's fees, in the event of Spiech Michigan's default.

158.    Spiech Michigan failed to make payment to any of the Growers for their Produce, and Principals failed to cause Spiech Michigan to make any payments to the Growers after issuing the Promissory Notes and, on information and belief, never intended to pay these Growers, but, instead, issued the Promissory Notes for the fraudulent purposes of creating the false impression that it possessed the ability to pay, to buy time until Spiech Michigan could file for bankruptcy, to induce the Growers to refrain from taking action to collect the debt owed to them, and to induce the Growers to continue to sell Produce to Spiech Michigan.

159.    Further, Spiech Michigan, under the direction, management, and control of Principals entered into the Distribution Agreement with Produce Pay on August 30, 2017.

160.    Under the Distribution Agreement, Spiech Michigan, by and through Principal Tim Spiech, "certifie[d] that it ha[d] title to such [Produce] and [was] legally capable of transferring the title to" Produce Pay. *See Exhibit F*, Part II, §1(d) and §3.2(c).

161.    Spiech Michigan, by and through Principal Tim Spiech, further agreed and warranted under the Distribution Agreement that the "Produce [was] free from any and all liens, encumbrances, charges, and security interests." *See Exhibit F*, Part II, §3.2(b).

162.    Principals were aware and had actual knowledge that the agreements and warranties made as to Spiech Michigan's ownership and title to the Produce was false and misleading because, on information and belief, the Produce was in fact completely collateralized by multiple lenders

on agricultural and business loans, and subject to multiple security interests, liens, and encumbrances, and therefore, Spiech Michigan did not have clean, transferrable title to such Produce.

163.    After Tim Spiech uploaded each Pallet Report to the Platform, specifying the Produce Spiech Michigan wished to sell to Produce Pay, Produce Pay evaluated and, relying on the representations and warranties Tim Spiech made appurtenant thereto, accepted and digitally purchased the Produce identified on the uploaded pallet reports by paying an amount of fifty percent of the market value of the Produce, the agreed upon purchase price of the Produce, in full to Spiech Michigan. *See Exhibit DD*.

164.    Under the Agreement, Spiech Michigan, by and through Tim Spiech, agreed to act as Produce Pay's consignment agent and sell the Produce sold to Produce Pay identified on the Pallet Reports to third party purchasers on Produce Pay's behalf, collect the gross proceeds of such sales, and remit the full amount of the gross sales proceeds to Produce Pay. *See Exhibit F*.

165.    Instead of causing Spiech Michigan to uphold its obligations under the Distribution Agreement, Principals used the gross sale proceeds received for Produce Pay's Produce to invest into Spiech Georgia and shield it from Spiech Michigan's impending bankruptcy.

166.    On information and belief, Principals never intended to remit the gross sales proceeds to Produce Pay because less than three months after entering into the Distribution Agreement, on November 22, 2017, Spiech Michigan filed for bankruptcy.

167.    On information and belief, and because of their long history of PACA dealings the Principals knew that as a result of their failure to pay their Produce suppliers, including Plaintiffs, that they would lose their PACA license.

168.    On information and belief, Principals entered into the Distribution Agreement, uploaded the Pallet Reports, and falsely stated that Spiech Michigan had clean, and transferrable title to the Produce for the fraudulent purpose of buying time until Spiech Michigan could file for bankruptcy.

169.    On information and belief, Principals entered into the Distribution Agreement, uploaded the Pallet Reports, and falsely represented that they had clean and transferrable title to the Produce for the fraudulent purpose of collecting and keeping the money that Produce Pay paid to purchase the Produce, as well as the gross sale proceeds collected from the third party purchasers, to invest it into Spiech Georgia and shield it from the creditors of Spiech Michigan, including Produce Pay.

170.    Produce Pay relied upon Principals false guarantees and warranties that they held clean and transferrable title to the Produce, and their promises to sell the Produce as Produce Pay's consignment agent, and paid Spiech Michigan in full for the Produce identified on the Pallet Reports.

171.    Subsequently, Principals threw Spiech Michigan into bankruptcy, and Produce Pay remains unpaid for the Produce Spiech Michigan and the Principals sold on its behalf for the full amount of the Produce Spiech Michigan sold as Produce Pay's consignment agent. *See Exhibit DD*.

172.    Principals' aforementioned breaches of their obligations of good faith and fair dealing constitute violations of Section 2 of PACA.

173.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

174.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

## COUNT III
## UNFAIR TRADE PRACTICE – 7 U.S.C. § 499b(4)
## BREACH OF GOOD FAITH AND FAIR DEALING UNDER PACA PRINCIPALS

175.    Plaintiff re-alleges paragraphs 1 through 24, 32 through 125, 126 through 142, and 143 through 174 as though fully set forth herein.

176.    At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

177.    At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

178.    At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control Spiech Michigan's financial dealings. *See Exhibits B, E, H,* and *I.*

179.    At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

180.    As a PACA licensee, grower's agent, consignment agent, dealer, or broker of Produce, Spiech Michigan, Spiech Georgia, and their Principals possessed a statutory duty to deal with Plaintiffs pursuant to a standard of honesty in fact and was further obligated to observe commercial standards of fair dealing in the Produce trade, which is defined, *inter alia*, in Section 2 of PACA.

181.    Upon information and belief, at all times relevant hereto, Spiech Michigan lacked

the liquidity or free cash flow to pay Plaintiff for the Produce identified in *Exhibits K* through *W* and *DD*.

182.    Spiech Michigan lacked adequate capitalization to pay its unpaid Produce suppliers and to sustain any losses resulting from its inability to collect upon its own accounts receivable.

183.    Upon information and belief, at all times relevant hereto, Spiech Michigan was insolvent.

184.    Upon information and belief, at all times relevant hereto, Spiech Michigan's liabilities exceeded its assets.

185.    Principals possessed actual and constructive knowledge of Spiech Michigan's insolvency. *See Exhibits Y* through *CC*.

186.    Upon information and belief, Principals failed to preserve sufficient funds to fully satisfy all of Spiech Michigan's obligations to its unpaid Produce suppliers, including Plaintiffs.

187.    Principals improperly shifted the risk of Spiech Michigan's undercapitalization or bad debt risk to Plaintiffs and its other unpaid Produce suppliers.

188.    Principals failed to voluntarily cease business operations and otherwise to refrain from purchasing Produce on credit while Spiech Michigan was either insolvent or during a time when Spiech Michigan's liabilities exceeded its assets or it was unable to pay its just debts when they became due.

189.    Principals breached their obligation of good faith and fair dealing by, *inter alia*, buying Produce on credit when the Principals knew or should have known of Spiech Michigan's insolvency, making false and misleading statements in connection with the Produce transactions identified in *Exhibits K* through *W* and *DD*, and failing to pay Plaintiffs for the Produce shipments identified in *Exhibits K* through *W* and *DD*.

190. Principals further breached their duties of good faith and fair dealing by failing to ensure that Spiech Michigan's funds were freely available to satisfy its outstanding obligations to Plaintiffs or other similarly situated Produce suppliers.

191. Principals also breached their obligation of good faith and fair dealing by making oral and written promises that they would pay the Plaintiffs in full for the Produce Spiech Michigan received from them with no intention of paying the Growers as promised.

192. Principals breached their obligations of good faith and fair dealing by issuing the August Letters, Promissory Notes, and Payment Plans to certain Growers promising to pay the Growers with no intention of ever paying the Growers as promised. *See Exhibits Y* through *CC.*

193. Principals failed to make payment to any of these Growers or cause Spiech Michigan to make any payment to the Growers, after issuing the August Letters.

194. Principals assured the Growers in the Payment Plan that Spiech Michigan was profitable in 2017, which was false and misleading because a little over a month later, on November 21, 2017, Spiech Michigan filed for protection under Chapter 11 of the United States Bankruptcy Code.

195. Following its admissions of debt and promises to pay, Principals failed to make any effort to address the past due accounts.

196. Principals breached their obligations of good faith and fair dealing by creating the false impression that it possessed the ability to pay to buy time until Spiech Michigan could file for bankruptcy, induce the Growers to refrain from taking any action to collect the debt owed to them, and to induce the Plaintiffs to continue to sell Produce to Spiech Michigan.

197. Instead of using such proceeds to pay the Growers, Principals utilized the proceeds from the sale of Growers' Produce to invest its resources into Spiech Georgia, siphon assets away

from Spiech Michigan to hide them from its creditors, and shield such assets from Spiech Michigan's impending bankruptcy.

198.    Further, Principals hid Spiech Georgia's existence from the Growers so that the Growers would not know that Principals were diverting the proceeds of the Growers' Produce to fund the Georgia growing operation, pay Georgia labor costs transport labor, materials, and equipment to Georgia, and generally invest the funds into Spiech Georgia, which is exempt from PACA regulation, to keep it from it unpaid Produce suppliers, including Plaintiffs. *See Exhibit I.*

199.    Spiech Michigan, under the direction, management, and control of Principals entered into the Distribution Agreement with Produce Pay on August 30, 2017 and certified to Produce Pay that Spiech Michigan had clean, marketable title to the Produce it sold to Produce Pay, and that such Produce was unencumbered by liens, or other security interests. *See Exhibit F*, Part II, §1(d) and §3.2(c).

200.    The Produce, was in fact, completely collateralized by multiple lenders on agricultural and business loans, and subject to multiple security interests, liens, and encumbrances, and therefore, Spiech Michigan did not have clean, transferrable title to such Produce.

201.    Spiech Michigan, by and through Principals, induced Produce Pay to pay the full agreed upon purchase price for said Produce, and agreed to act as Produce Pay's consignment agent to sell Produce Pay's Produce in good faith, collect the gross proceeds of such sales, and remit the full amount of the gross sales proceeds to Produce Pay.

202.    Instead of causing Spiech Michigan to uphold its obligations under the Distribution Agreement, Principals used the gross sale proceeds received for Produce Pay's Produce to invest into Spiech Georgia, avoid its debt to Produce Pay and shield it from Spiech Michigan's impending bankruptcy, which occurred less than three months after entering into the Distribution Agreement.

203.    On information and belief, and because of their long history of PACA dealings, the Principals knew that as a result of their failure to pay their Produce suppliers, including Plaintiffs, that they would lose their PACA license.

204.    Instead of using the proceeds for its sale of Plaintiffs' Produce to pay its debts to Plaintiffs, Principals collected and kept the money as well as the gross sale proceeds collected from the third party purchasers, to invest it into Spiech Georgia, which is exempt from PACA regulation, and shield it from the creditors of Spiech Michigan, including Plaintiffs and attempt to avoid liability under PACA.

205.    Subsequently, Principals threw Spiech Michigan into bankruptcy, and all of the Produce related transactions conducted with Plaintiffs as identified in *Exhibits K* through *W* and *DD* remain unpaid.

206.    Principals' aforementioned breaches of their obligations of good faith and fair dealing constitute violations of Section 2 of PACA.

207.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

208.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

**COUNT IV**
**UNFAIR TRADE PRACTICE – 7 U.S.C. § 499b(4)**
**BREACH OF EXPRESS OR IMPLIED DUTIES**
**PRINCIPALS**

209.    Plaintiff re-alleges paragraphs Plaintiff re-alleges paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, and 175 through 208 as though fully set forth herein.

210.    At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H, and I.*

211.    At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H, and I.*

212.    At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control Spiech Michigan's financial dealings. *See Exhibits B, E, H, and I.*

213.    At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

214.    As a PACA licensee, grower's agent, consignment agent, dealer, or broker of Produce, Spiech Michigan possessed a duty to "perform any specification or duty, express or implied, arising out of any undertaking in connection with any [Produce] transaction" with Plaintiff other similarly situated Produce suppliers.

215.    As a PACA licensee, grower's agent, consignment agent, and dealer or broker of Produce, Spiech Michigan possessed a duty to "truly and correctly account" to Plaintiff.

216.    As a PACA licensee, grower's agent, consignment agent, and dealer or broker of Produce, Spiech Michigan possessed a duty to "make full payment promptly" to Plaintiff.

217.    As a PACA licensee, grower's agent, consignment agent, and dealer or broker of Produce, Spiech Michigan possessed a duty to "exercise reasonable care and diligence in disposing of the produce promptly in a fair and reasonable manner."

218.    As a persons listed on the PACA license or otherwise in control of or in a position to control Spiech Michigan, the Principals also had the duties and responsibilities set forth in the preceding paragraphs.

219.    At all times relevant to this action, each of the Principals were officers, directors, or members of Spiech Michigan, and the persons in charge of its business undertakings. *See Exhibits B, E, H, and I.*

220.    On information and belief, at all times relevant to this action the Principals were engaged, directly or indirectly, in the business of buying or selling Produce in interstate or foreign commerce in wholesale or jobbing quantities.

221.    At all times relevant to this action, the Principals controlled and managed Spiech Michigan's operations and had control over Spiech Michigan's financial dealings. *See Exhibits B, E, H, and I.*

222.    At all times relevant to this action, the Principals were in a position to control and manage Spiech Michigan's operations and had the ability to control Spiech Michigan's financial dealings. *See Exhibits B, E, H, and I.*

223.    At all times relevant to this action, the Principals had the authority to direct the payment of Spiech Michigan's operating funds and otherwise had the power to direct the application or disposition of its assets.

224.    At all times relevant to this action, the Principals were in a position to influence Spiech Michigan's application of its operating funds and otherwise had the power to influence the application or disposition of its assets.

225.    Upon information and belief, at all times relevant to this action, the Principals were the authorized signatories on Spiech Michigan's bank account(s) and otherwise had the power to

direct the application or disposition of its assets. *See Exhibits B, E, H, and I.*

226.    As officers, directors, or members of Spiech Michigan, the Principals had a statutory duty to ensure that Spiech Michigan performed all duties, express or implied, arising out of Spiech Michigan's undertakings in connection with Spiech Michigan's Produce transactions, which included, *inter alia*, ensuring Spiech Michigan's compliance with its obligations to Plaintiffs under PACA.

227.    As officers, directors, or members of Spiech Michigan, the Principals were in a position to exercise judgement, discretion, or control over Spiech Michigan's operations and financial dealings, which included, *inter alia*, ensuring that Spiech Michigan neither acted nor failed to act in any manner that could result in Spiech Michigan's violation of its obligations to Plaintiffs under PACA or which could prejudice or impair the ability of Spiech Michigan's unpaid Produce suppliers, including Plaintiffs, to recover money owed to each of them in connection with any Produce transactions involving the Company.

228.    As officers, directors, members, or shareholders of Spiech Michigan, the Principals knew or should have known of Spiech Michigan's failure to pay each of Plaintiffs' unpaid Produce transactions as they fell due.

229.    As officers, directors, or members of Spiech Michigan, the Principals possessed the power necessary to counteract or obviate the decisions of Spiech Michigan not to pay Plaintiffs, to make false or misleading statement to induce Plaintiffs to continue doing business with Spiech Michigan, and to induce Plaintiffs to delay or forgo collections efforts for the purpose of funneling assets to Spiech Georgia to shield them from Spiech Michigan's impending bankruptcy.

230.    Upon information and belief, Principals failed to preserve sufficient funds to fully satisfy all of Spiech Michigan's obligations to its unpaid Produce suppliers, including Plaintiffs.

231.    Principals improperly shifted the risk of Spiech Michigan's undercapitalization or bad debt risk to Plaintiffs and its other unpaid Produce suppliers.

232.    Because Principals controlled or were in a position to control Spiech Michigan, and Plaintiffs' invoices have not been paid from Spiech Michigan's assets as its bills fell due, the Principals breached their express or implied duties under Section 2 of PACA.

233.    Because the Principals were either in control or were in a position to control Spiech Michigan, and the Principals failed to ensure that there were, at all times, sufficient assets available to satisfy all of Spiech Michigan's obligations to Plaintiffs as unpaid Produce suppliers, the Principals breached their express or implied duties under Section 2 of PACA.

234.    Because Principals were either in control or in a position to control Spiech Michigan, and the Principals failed to cause Spiech Michigan to make, or ensure that Spiech Michigan made full payment promptly to Plaintiffs in connection with their Produce transactions, the Principals breached their express or implied duties under Section 2 of PACA.

235.    Because Principals were either in control or in a position to control Spiech Michigan, and the Principals failed to cause Spiech Michigan to truly and correctly account, or ensure that Spiech Michigan truly and correctly accounted for its Produce transactions with Plaintiff, the Principals breached their express or implied duties under Section 2 of PACA.

236.    Because Principals were either in control or in a position to control Spiech Michigan, and the Principals failed to cause Spiech Michigan to use reasonable care, or ensure that Spiech Michigan used reasonable care in disposing of Plaintiffs' Produce (i.e., selling it to third parties for the best price possible), the Principals breached their express or implied duties under Section 2 of PACA.

237.    Because Principals were either in control or in a position to control Spiech Michigan, and the Principals failed to voluntarily cease business operations and otherwise to refrain from purchasing Produce on credit while Spiech Michigan was either insolvent or during a time when Spiech Michigan's liabilities exceeded its assets or it was unable to pay its just debts when they became due, the Principals breached their express or implied duties under Section 2 of PACA.

238.    Because Principals were either in control or in a position to control Spiech Michigan, by failing to ensure that Spiech Michigan's funds were freely available to satisfy its outstanding obligations to Plaintiffs or other similarly situated Produce suppliers, the Principals breached their express or implied duties under Section 2 of PACA.

239.    Because Principals were either in control or in a position to control Spiech Michigan, by making the verbal and written promises to pay including the August Letters, Promissory Notes, and Payment Plans, created the false impression that it possessed the ability to pay to buy time until Spiech Michigan could file for bankruptcy, induced the Plaintiffs to refrain from taking any action to collect the debt owed to them, and induced the Growers to continue to sell Produce to Spiech Michigan, the Principals breached their express or implied duties under Section 2 of PACA.

240.    Because Principals were either in control or in a position to control Spiech Michigan, and instead of using such proceeds to pay the Growers, Principals utilized the proceeds from the sale of Growers' Produce to invest its resources into Spiech Georgia, siphon assets away from Spiech Michigan to hide them from its creditors, and shield such assets from Spiech Michigan's impending bankruptcy, the Principals breached their express or implied duties under Section 2 of PACA.

241.   Because Principals were either in control or in a position to control Spiech Michigan, and hid Spiech Georgia's existence from the Growers so that the Growers would not know that Principals were diverting the proceeds of the Growers' Produce to fund the Georgia growing operation, the Principals breached their express or implied duties under Section 2 of PACA.

242.   Because Principals were either in control or in a position to control Spiech Michigan, and instead of using the proceeds from the sale of Plaintiffs' Produce to pay Plaintiffs, Principals utilized the proceeds to pay for Georgia labor costs, to transport labor, materials, and equipment to Georgia, and generally invest the funds into Spiech Georgia, which is exempt from PACA regulation, to keep the assets away from it unpaid Produce suppliers, including Plaintiffs, the Principals breached their express or implied duties under Section 2 of PACA. *See Exhibit I.*

243.   Because Principals were either in control or in a position to control Spiech Michigan, and failed to counteract or obviate Spiech Michigan's false promises to pay Plaintiffs, including the August Letters, Promissory Notes, and Payment Plans, and failure or refusal to fulfill such promises, the Principals breached their express or implied duties under Section 2 of PACA.

244.   Because Principals were either in control or in a position to control Spiech Michigan, and failed to counteract or obviate Spiech Michigan's misrepresentations regarding its ownership and clean title to the Produce it sold to Produce Pay, fraudulently inducing Produce Pay to purchase the Produce identified in Exhibit , and diverting the proceeds from the sale of Produce Pay's Produce to Spiech Georgia to avoid remitting payment to Produce Pay, the Principals breached their express or implied duties under Section 2 of PACA.

245.   Because Principals were either in control or in a position to control Spiech Michigan, and the Principals failed to counteract or obviate the decisions of Spiech Michigan not

to pay Plaintiffs from Spiech Michigan's assets and instead diverted the proceeds from the sale of Plaintiffs' Produce to Spiech Georgia for the purpose of avoiding their debts to Plaintiffs, the Principals breached their express or implied duties under Section 2 of PACA.

246.   All of the Produce related transactions conducted with Plaintiffs as identified in *Exhibits K* through *W* and *DD* remain unpaid.

247.   Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

248.   As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

**COUNT V**
**CONSPIRACY TO DEFRAUD**
**PRINCIPALS & SPIECH GEORGIA**

249.   Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, and 209 through 248 as though fully set forth herein.

250.   On information and belief, Defendants each willingly and willfully conspired and agreed among themselves, and with Spiech Michigan, to perform the tortious and other wrongful acts and schemes set forth in this Complaint.

251.   At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

252.   At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

253. At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control financial dealings. *See Exhibits B, E, H, and I.*

254. At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

255. Based on their positions of management and control, and based on the August Letters and the Promissory Notes and Payment Plans they issued to the Growers, Principals were aware of Spiech Michigan's financial hardship. *See Exhibits Y* through *CC.*

256. Additionally, Principals had actual and constructive knowledge of the contracts between Spiech Michigan and the Growers, and Spiech Michigan's inability to pay its debts to Plaintiffs because of their positions of management, direction, and control over Spiech Michigan and Spiech Georgia's financial and business dealings.

257. In fact, Principals admittedly designed the Grower contracts to permit Spiech Michigan to return as little money as possible to the Growers. *See* Excerpt from Testimony of Tim Spiech, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 233:10-22, Jan. 4, 2018 attached hereto as *Exhibit FF.*

258. The Principals also designed their contracts to conceal the amount of return the Growers could expect until the Growers were paid, if at all. *See* Excerpt from Testimony of Tim Spiech, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 240:10-13, Jan. 4, 2018 attached hereto as *Exhibit GG.*

259. The Growers' expectation of payment for their Produce was based on a formula contained in the Growers' contracts which showed the Growers how their payment would be

calculated, but the contracts did not provide a way for Growers to calculate or otherwise determine what they would be paid in exchange for their Produce. *See Exhibit GG.*

260. Spiech Michigan, under Principals' management, direction, and control, received the Produce from Growers, marked up the price by adding in fees, expenses, and costs, and sold the Produce to third party purchasers.

261. Thereafter, under the direction, management, and control of the Principals, Spiech Michigan collected the sale price, plus the additional fees and expenses, from the third party purchasers.

262. However, Spiech Michigan, under the direction, management, and control of Principals, elected not to pay the Growers.

263. Principals, acting in concert, utilized Spiech Michigan as a conduit to siphon assets into Spiech Georgia.

264. Principals diverted the assets collected by Spiech Michigan from its resale of Growers' Produce, which should have been used to pay the Growers, to Spiech Georgia for the purpose of hiding such assets and otherwise placing assets outside the reach of its creditors, including Plaintiffs, and to insulate Defendants from Spiech Michigan's impending bankruptcy.

265. Specifically, instead of paying the Growers, the Principals elected to use the money that should have been used to pay the growers to purchase new harvesters costing $120,000.00, which Defendants used in both Michigan and Georgia, pay $20,000.00 in labor costs for Spiech Georgia, and $22,000.00 in fuel, food, supplies, equipment, housing for harvest laborers, and technology upgrades for both Spiech Michigan and Spiech Georgia. *See Exhibit I.*

266. Additionally, under the Principals' direction, management, and control, on August 30, 2017, Spiech Michigan entered into the Distribution Agreement with Produce Pay.

267.     Under the Distribution Agreement, Spiech sold Produce to Produce Pay and in return, Produce Pay paid Spiech Michigan a fixed purchase price for the Produce.

268.     Then, pursuant to the Distribution Agreement, Spiech Michigan acted as Produce Pay's consignment agent.

269.     As Produce Pay's consignment agent, Spiech Michigan sold the Produce to third party purchasers, invoiced the third parties for such sales, and collected the proceeds from such sales.

270.     In fact, Spiech Michigan, by and through Principals, admittedly collected all of the proceeds from the third parties.

271.     As Produce Pay's consignment agent, Spiech Michigan had a duty to collect and remit to Produce Pay the full amount of the gross sale proceeds received from its sale of Produce Pay's Produce, and, thereafter, Produce Pay would be obligated to pay Spiech Michigan a commission.

272.     Spiech Michigan collected the gross sale proceeds, but under the direction, management, and control of Principals, elected not to remit the full price of Produce Pay's Produce.

273.     On information and belief, Principals intended to enter into the Distribution Agreement to keep the business alive until they could file for Spiech Michigan's bankruptcy.

274.     Principals entered into the Distribution Agreement at that particular time for the purpose of obtaining the purchase price money from Produce Pay before they filed for Spiech Michigan's bankruptcy so they would be able to process and sell Spiech Michigan's stockpile of frozen blueberries. On information and belief, if Spiech Michigan had filed for bankruptcy any earlier, they would have forfeited those assets.

275.    On information and belief, Principals never intended to uphold their obligations under the contracts with Growers or the Distribution Agreement or cause Spiech Michigan to uphold its obligations.

276.    On information and belief, Principals never intended to pay their debts to the Plaintiffs.

277.    On information and belief, instead of using the money Spiech Michigan collected from the resale of Growers' Produce and the consignment sale of Produce Pay's Produce, Principals conveyed the proceeds into Spiech Georgia or made disbursements to themselves to keep assets away from Spiech Michigan's creditors, including Plaintiffs.

278.    Principals failed to object or otherwise act to prevent Defendants' decision not to pay Growers for their Produce.

279.    To effectuate the purpose of defrauding Plaintiffs, Principals issued the August Letters, the Promissory Notes, and the Proposed Payment Plans to convince Growers that Spiech Michigan would pay their debts in full and to induce them to refrain from taking measures to collect the debt that Defendants owed them for the Produce identified on *Exhibits K* through *W*, until the Defendants could throw Spiech Michigan into bankruptcy in attempt to extinguish their debts to the Plaintiffs.

280.    On information and belief, in preparation to throw Spiech Michigan into bankruptcy, the Principals invested the assets collected from the resale of Produce purchased from Growers and the proceeds from the sale of Produce Pay's Produce into Spiech Georgia, instead of using it to pay the Plaintiffs, so that such assets would be separate from the bankruptcy estate.

281.    Spiech Michigan, under the direction, management, and control of Principals entered into the Distribution Agreement with Produce Pay.

282. Under the Distribution Agreement, Spiech Michigan, by and through Principal Tim Spiech, "certifie[d] that it ha[d] title to such [Produce] and [was] legally capable of transferring the title to" Produce Pay. *See Exhibit F*, Part II, §1(d) and §3.2(c).

283. Spiech Michigan, by and through Principal Tim Spiech, further agreed and warranted under the Distribution Agreement that the "Produce [was] free from any and all liens, encumbrances, charges, and security interests." *See Exhibit F*, Part II, §3.2(b).

284. Principals were aware and had actual knowledge that the agreements and warranties made as to Spiech Michigan's ownership and title to the Produce was false and misleading because, on information and belief, the Produce was in fact completely collateralized by multiple lenders on agricultural and business loans, and subject to multiple security interests, liens, and encumbrances, and therefore, Spiech Michigan did not have clean, transferrable title to such Produce.

285. After Tim Spiech uploaded each Pallet Report to the Platform, specifying the Produce he wished to sell to Produce Pay, Produce Pay evaluated and, relying on the representations and warranties Tim Spiech made appurtenant thereto, digitally purchased the Produce identified on the uploaded pallet reports by paying an amount of fifty percent (50%) of the market value of the Produce, the agreed upon purchase price of the Produce, in full to Spiech Michigan.

286. Under the Agreement, Spiech Michigan, by and through Tim Spiech, agreed to act as Produce Pay's consignment agent and sell the Produce sold to Produce Pay identified on the Pallet Reports to third party purchasers on Produce Pay's behalf, collect the gross proceeds of such sales, and remit the full amount of the gross sales proceeds to Produce Pay. *See Exhibit F*.

287.    Instead of causing Spiech Michigan to uphold its obligations under the Distribution Agreement, Principals used the gross sale proceeds received for Produce Pay's Produce to invest into Spiech Georgia and shield it from Spiech Michigan's impending bankruptcy.

288.    On information and belief, Principals never intended to remit the gross sales proceeds to Produce Pay because less than three months after entering into the Distribution Agreement, on November 22, 2017, Spiech Michigan filed for bankruptcy.

289.    On information and belief, and because of their long history of PACA dealings the Principals knew that as a result of their failure to pay their Produce suppliers, including Plaintiffs, that they would lose their PACA license.

290.    On information and belief, Principals entered into the Distribution Agreement, uploaded the Pallet Reports, and falsely stated that Spiech Michigan had clean, and transferrable title to the Produce for the fraudulent purpose of inducing Produce Pay to pay Spiech Michigan for the Produce Spiech sold to Produce Pay, investing such funds into Spiech Georgia to shield it from creditors, including Plaintiffs, and buy time until Spiech Michigan could file for bankruptcy.

291.    On information and belief, Principals entered into the Distribution Agreement, uploaded the Pallet Reports, and falsely stated that they had clean and transferrable title to the Produce for the fraudulent purpose of collecting and keeping the money that Produce Pay paid to purchase the Produce, as well as the gross sale proceeds collected from the third party purchasers, to invest it into Spiech Georgia and shield it from the creditors of Spiech Michigan, including Produce Pay.

292.    Produce Pay relied upon Principals false guarantees and warranties that they held clean and transferrable title to the Produce, and their promises to sell the Produce as Produce Pay's consignment agent, and paid Spiech Michigan for the Produce identified on the Pallet Reports.

293. Subsequently, Principals funneled the funds collected from the sale of Produce Pay's Produce into Spiech Georgia and threw Spiech Michigan into bankruptcy, and Produce Pay remains unpaid for the Produce Spiech Michigan and the Principals sold on its behalf.

294. In further preparation to throw Spiech Michigan into bankruptcy and their attempt to extinguish its debts to Plaintiffs, Principals Steve, Bradley, and Robin sold the majority of their shares to Tim. *See Exhibit E.*

295. Leading up to Spiech Michigan's bankruptcy, Principals paid the operating costs, improvement costs, and the debts of certain creditors, such as lenders and land lessors, of Spiech Georgia instead of paying the Plaintiffs. *See* Excerpt from Testimony of Eve Stone, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 15:18-16:7, Jan. 31, 2018 attached hereto as *Exhibit HH.*

296. As of the date of this filing, Spiech Michigan's debts to Plaintiffs remain unpaid.

297. Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

298. As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

## COUNT VI
## FRAUD
## PRINCIPALS

299. The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175 through 208, 209 through 248, and 249 through 298 as though fully set forth herein.

300. At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

301. At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

302. At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control financial dealings. *See Exhibits B, E, H,* and *I.*

303. At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

304. Principals made several false statements and representations regarding the Spiech Michigan's solvency and its ability to pay Plaintiffs for the Produce transactions at issue herein.

305. Spiech Michigan, under the direction, control, and management of the Principals, entered into the Contracts with Growers for the purpose of purchasing Produce. *See Exhibit J.*

306. Growers cultivated and grew the Produce, and delivered it to Spiech Michigan.

307. Spiech Michigan received and accepted all of the Produce identified in Exhibits *K* through *W* and *DD* and failed to make any rejection or objection whatsoever.

308. Under the direction, management, and control of Principals, Spiech Michigan failed to pay any of the Plaintiffs for any of the Produce identified in *Exhibits K* through *W* and *DD* within the payment terms agreed upon by the parties.

309. Even before the first payment came due to the Plaintiffs on August 31, 2017, Spiech Michigan, by and through the Principals, began making oral and written promises that they would

pay the Plaintiffs in full for the Produce Spiech Michigan received from them. *See Exhibits Y through CC.*

310.    Beginning in August, Spiech Michigan, by and through Principal Steve Spiech, issued the August Letters to a number of the Plaintiffs promising to pay the Plaintiffs' in full for each of the Produce transactions before the end of the 2017 fiscal year and promising to impose a 6% interest rate on themselves. *See Exhibits Y* through *BB*.

311.    Spiech Michigan, by and through the Principals' direction, control, and management, did not make any payment to any of the Plaintiffs after issuing the August Letters.

312.    Instead, on information and belief, Principals issued the August Letter for the fraudulent purposes of creating the false impression that it possessed the ability to pay, to buy time until Spiech Michigan could file for bankruptcy, and to induce the Plaintiffs to continue to sell Produce to Defendants.

313.    Subsequently, Principals, by and through Steve Spiech, issued Promissory Notes with incorporated Payment Plans to a number of Plaintiffs, again promising to pay the Plaintiffs in full, but delaying the start of payment into 2018 and promising to make monthly payments through 2020. *See Exhibit CC.*

314.    In the August Letters, Principals assured the Plaintiffs in the Payment Plan that Spiech Georgia was profitable in 2017. *See Exhibit CC.*

315.    Principals had actual and constructive knowledge that Spiech Michigan would not have the ability to pay the Plaintiffs and never intended to pay the Plaintiffs because a little over a month after issuing the Promissory notes and Payment Plans, on November 22, 2017, Spiech Michigan filed for protection under Chapter 11 of the United States Bankruptcy Code.

316.     On information and belief, and because of their long history of dealings the Principals knew that as a result of their failure to pay their Produce suppliers, including Plaintiffs, that they would lose their PACA license.

317.     Defendants failed to make any payment to any of the Plaintiffs after issuing the Promissory Notes and, on information and belief, never intended to pay the Plaintiffs, but, instead, issued the August Letters and the Promissory Notes and Payment Plans for the fraudulent purposes of creating the false impression that it possessed the ability to pay, to buy time until Spiech Michigan could file for bankruptcy, to induce the Growers to refrain from implementing collections efforts.

318.     Growers relied upon Principals' false assurances of payment and indeed refrained from brining collections actions against Spiech Michigan or the Principals.

319.     Principals made the false promises to pay for the fraudulent purpose of diverting the proceeds of their sale of the Growers' Produce to third parties away from Spiech Michigan instead of paying the Growers.

320.     Specifically, instead of paying the Growers, the Principals elected to use the money that should have been used to pay the growers to purchase new harvesters costing $120,000.00, pay $20,000.00 in labor costs for Spiech Georgia, and $22,000.00 in fuel, food, supplies, equipment, housing for harvest laborers, and technology upgrades for Spiech Georgia. *See Exhibit I.*

321.     Subsequently, Principals threw Spiech Michigan into bankruptcy on November 22, 2017, and the Growers remain unpaid for the Produce they grew and supplied to Spiech Michigan and Principals.

322.    Spiech Michigan, under the direction, management, and control of Principals entered into the Distribution Agreement with Produce Pay.

323.    Under the Distribution Agreement, Spiech Michigan, by and through Principal Tim Spiech, "certifie[d] that it ha[d] title to such [Produce] and [was] legally capable of transferring the title to" Produce Pay. *See Exhibit F*, Part II, §1(d) and §3.2(c).

324.    Spiech Michigan, by and through Principal Tim Spiech, further agreed and warranted under the Distribution Agreement that the "Produce [was] free from any and all liens, encumbrances, charges, and security interests." *See Exhibit F*, Part II, §3.2(b).

325.    Principals were aware and had actual knowledge that the agreements and warranties made as to Spiech Michigan's ownership and title to the Produce was false and misleading because, on information and belief, the Produce was in fact completely collateralized by multiple lenders on agricultural and business loans, and subject to multiple security interests, liens, and encumbrances, and therefore, Spiech Michigan did not have clean, transferrable title to such Produce.

326.    After Tim Spiech uploaded each Pallet Report to the Platform, specifying the Produce he wished to sell to Produce Pay, Produce Pay evaluated and, relying on the representations and warranties Tim Spiech made appurtenant thereto, digitally purchased the Produce identified on the uploaded pallet reports by paying an amount of fifty percent of the market value of the Produce, the agreed upon purchase price of the Produce, in full to Spiech Michigan.

327.    Under the Agreement, Spiech Michigan, by and through Tim Spiech, agreed to act as Produce Pay's consignment agent and sell the Produce sold to Produce Pay identified on the Pallet Reports to third party purchasers on Produce Pay's behalf, collect the gross proceeds of such sales, and remit the full amount of the gross sales proceeds to Produce Pay.

328. Instead of causing Spiech Michigan to uphold its obligations under the Distribution Agreement, Principals used the gross sale proceeds received for Produce Pay's Produce to invest into Spiech Georgia and shield it from Spiech Michigan's impending bankruptcy.

329. On information and belief, Principals never intended to remit the gross sales proceeds to Produce Pay because less than three months after entering into the Distribution Agreement, on November 22, 2017, Spiech Michigan filed for bankruptcy.

330. On information and belief, and because of their long history of PACA dealings, the Principals knew that as a result of their failure to pay their Produce suppliers, including Plaintiffs, that they would lose their PACA license.

331. On information and belief, Principals entered into the Distribution Agreement, uploaded the Pallet Reports, and falsely stated that Spiech Michigan had clean, and transferrable title to the Produce for the fraudulent purpose of buying time until Spiech Michigan could file for bankruptcy.

332. On information and belief, Principals entered into the Distribution Agreement, uploaded the Pallet Reports, and falsely stated that they had clean and transferrable title to the Produce for the fraudulent purpose of collecting and keeping the money that Produce Pay paid to purchase the Produce, as well as the gross sale proceeds collected from the third party purchasers, to invest it into Spiech Georgia and shield it from the creditors of Spiech Michigan, including Produce Pay.

333. Produce Pay relied upon Principals false guarantees and warranties that they held clean and transferrable title to the Produce, and their promises to sell the Produce as Produce Pay's consignment agent, and paid Spiech Michigan in full for the Produce identified on the Pallet Reports.

334.    Subsequently, Principals threw Spiech Michigan into bankruptcy, and Produce Pay remains unpaid for the Produce Spiech Michigan and the Principals sold on its behalf.

335.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

336.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

**COUNT VII**
**BREACH OF DUTY TO CORPORATE CREDITORS**
**PRINCIPALS**

337.    The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, 249 through 298, and 299 through 336 as though fully set forth herein.

338.    At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

339.    At all times relevant hereto, the Principals controlled and managed Spiech Michigan's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

340.    At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan's operations and had the ability to control financial dealings. *See Exhibits B, E, H,* and *I.*

341.    At all times, Spiech Michigan acted or failed to act through Principals.

342.    At all times relevant hereto, Spiech Michigan lacked the ability to pay its creditors and was insolvent.

343. At all times relevant hereto, Spiech Michigan's liabilities exceeded its assets.

344. At all times relevant to this action, the Principals had the authority to direct the payment of Spiech Michigan's operating funds and otherwise had the power to direct the application or disposition of Spiech Michigan's assets.

345. At all times relevant to this action, the Principals were in a position to influence Spiech Michigan's application of their operating funds and otherwise had the power to influence the application or disposition of all of Spiech Michigan's assets.

346. At all times relevant to this action, the Principals were the authorized signatories on Spiech Michigan's bank account(s) and otherwise had the power to direct the application or disposition of Spiech Michigan's assets.

347. As officers, directors, members, or shareholders of Spiech Michigan, the Principals were statutory trustees with a duty to safeguard Spiech Michigan's assets, and were required to maintain the assets in a manner in the best interest of the creditors, including the Plaintiffs.

348. As officers, directors, or members of Spiech Michigan, the Principals had actual and constructive knowledge of the contracts between Spiech Michigan and the Plaintiffs, and Spiech Michigan's inability to pay its debts to Plaintiffs because of their positions of management, direction, and control over Spiech Michigan's financial and business dealings.

349. As officers, directors, members, or shareholders of Spiech Michigan, the Principals possessed the power necessary to counteract or obviate the decisions of Spiech Michigan not to pay Plaintiffs.

350. As the officers, directors, members, or shareholders of Spiech Georgia and Spiech Michigan, the Principals are charged with the duty of conserving and managing the remaining assets of Spiech Michigan, in trust for the benefit of the creditors of Spiech Michigan.

351.    The Principals breached their duty to creditors of Spiech Michigan, including Plaintiffs, to conserve and manage Spiech Michigan's remaining assets in trust for the benefit of the creditors by conspiring to and in fact defrauding Plaintiffs.

352.    Because the Principals controlled and/or were in a position to control Spiech Michigan, and failed to cause Spiech Michigan to pay its debts to Plaintiffs as they fell due, the Principals have breached their fiduciary duties as Principals of Spiech Michigan during its insolvency.

353.    Because the Principals were either in control or were in a position to control Spiech Michigan, and the Principals failed to safeguard Spiech Michigan's assets, and failed to maintain the assets in a manner in the best interest of the creditors, including the Plaintiffs, the Principals have breached their fiduciary duties as trustees of Spiech Michigan's assets in its insolvency.

354.    Because the Principals were either in control of or were in a position to control Spiech Michigan, and the Principals failed to counteract or obviate the decisions of Spiech Michigan not to pay Plaintiffs, the Principals have breached their fiduciary duties to Plaintiffs as trustees of Spiech Michigan in its insolvency.

355.    Instead of conserving and managing the remaining assets of Spiech Michigan in trust, the Principals diverted the proceeds from Spiech Michigan's sale of Plaintiffs' Produce to Spiech Georgia for the purpose of buying time until Principals could throw Spiech Michigan into Bankruptcy, and to hide such assets and otherwise placing assets outside the reach of its creditors, including Plaintiffs, and to insulate Defendants from Spiech Michigan's impending bankruptcy.

356.    The Principals continue to hold any and all proceeds from the sale of Plaintiff's Produce having come into their possession as trustees for Plaintiffs' beneficial interest as creditors of an insolvent company. *See Exhibits K* through *W* and *DD*.

357.    Additionally, Principals concealed their diversion of the proceeds of Plaintiff's Produce from the Growers by failing or refusing to provide accountings of Spiech Michigan's sale of Grower's Produce and issuing the August Letters and Promissory Notes to the Growers.

358.    As officers, directors, members, or shareholders of Spiech Michigan, the Principals are personally liable for breaching their duty to creditors of Spiech Michigan, including the Plaintiffs, to conserve and manage Spiech Michigan's remaining assets in trust for the benefit of the creditors.

359.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

360.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

**COUNT VIII**
**INTENTIONAL INTERFERENCE WITH CONTRACT**
**PRINCIPALS**

361.    The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 249 through 298, and 299 through 336 as though fully set forth herein.

362.    At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H, and I.*

363.    At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H, and I.*

364. At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control financial dealings. *See Exhibits B, E, H, and I.*

365. At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

366. Plaintiffs and Spiech Michigan entered into the various contracts referenced in *Exhibits F, J, K* through *W, and DD.*

367. In each contract, Plaintiffs agreed to sell Produce to Spiech Michigan, and Spiech Michigan agreed to purchase Produce from Plaintiffs. Spiech Michigan also agreed to sell Produce Pay's Produce to third parties as Produce Pay's consignment agent. *See Exhibits F and J.*

368. Under the contracts, Spiech agreed to pay Growers for their Produce based upon the amount Spiech Michigan received upon reselling the Produce to third parties. *See Exhibit J.*

369. Plaintiffs delivered conforming goods to Spiech Michigan and have otherwise satisfied all conditions of said contracts.

370. Spiech Michigan received and accepted each of the shipments of Produce as identified in *Exhibits K* through *W and DD.*

371. Spiech Michigan did not reject or object to any of the Produce it received from Plaintiffs.

372. Spiech Michigan, under the direction, management, and control of Principals, sold all of the Produce it purchased from Plaintiffs to third parties, and collected the proceeds of the Produce from the third parties.

373. Spiech Michigan failed to pay for each shipment of Produce and other goods identified in *Exhibits K* through *W and DD.*

374. Contrary to Spiech Michigan's contractual obligation to use the Proceeds of Plaintiffs' Produce to pay the Plaintiffs, Principals diverted the assets collected by Spiech Michigan from its resale of Plaintiffs' Produce to Spiech Georgia for the purpose of hiding such assets and otherwise placing assets outside the reach of its creditors, including Plaintiffs, and to insulate Defendants from Spiech Michigan's impending bankruptcy.

375. Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

376. As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

**COUNT IX**
**CONVERSION**
**PRINCIPALS & SPIECH GEORGIA**

377. The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175 through 208, 209 through 248, 249 through 298, and 299 through 336, 337 through 360, and 361 through 376 as though fully set forth herein.

378. At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

379. At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

380. At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control financial dealings. *See Exhibits B, E, H,* and *I.*

381.   At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

382.   Upon information and belief, at all times relevant to this action, the Principals were the authorized signatories on Spiech Georgia and Spiech Michigan's bank account(s) and otherwise had the power to direct the application or disposition of said funds.

383.   Growers sold Produce to Spiech Michigan in the aggregate value of $1,288,398.31, which Spiech Michigan received and resold to third party purchasers as a grower's agent for each of the Growers.

384.   On information and belief, the third party purchasers paid Spiech Michigan promptly and in full for the same Produce. *See* Exhibit *FF* at 223:6-14.

385.   Spiech Michigan failed to pay Growers for the Produce it received and resold, and the Growers remain unpaid.

386.   Produce Pay consigned Produce to Spiech Michigan, which Spiech Michigan received and resold to third party purchasers on Produce Pay's behalf.

387.   As a PACA licensee, dealer, and broker of Produce, Spiech Michigan received and resold said Produce on consignment on Produce Pay's behalf.

388.   As a PACA licensee, consignment agent, and dealer of Produce, Spiech Michigan collected or received funds for or on behalf of Produce Pay.

389.   As Produce Pay's consignment agent, Spiech Michigan and Principals invoiced and collected the proceeds of Produce Pay's Produce in the aggregate amount of $1,002,273.70.

390.   As a PACA licensee, consignment agent, and dealer or broker of Produce, Spiech Michigan possessed a duty to fully and promptly remit the proceeds of such Produce sold on consignment to Produce Pay.

391. Speich Michigan failed to fully and promptly remit the proceeds of its sale of Produce Pay's produce.

392. On information and belief, under the direction, management, and control of Principals, Speich Michigan used the funds it received from the Growers, and the funds collected on Produce Pay's behalf, for purposes other than paying Plaintiffs, including investing the money into Speich Georgia to shield it from Speich Michigan's bankruptcy creditors and to pay their own salaries.

393. Specifically, instead of paying the Growers, the Principals elected to use the money that should have been used to pay the growers to purchase new harvesters costing $120,000.00, pay $20,000.00 in labor costs for Speich Georgia, and $22,000.00 in fuel, food, supplies, equipment, housing for harvest laborers, and technology upgrades for Speich Georgia. *See Exhibit I.*

394. As managers, officers, and directors of Speich Michigan, Principals failed to cause Speich Michigan to use such funds to pay Plaintiffs fully and promptly and failed to ensure that such funds were used to pay Plaintiffs fully and promptly.

395. On information and belief, Plaintiffs have converted, are now in the process of converting, to their own use and benefit, monies valued in excess of $2,220,831.68.

396. Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

397. As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

## COUNT X
## <u>UNJUST ENRICHMENT</u>
## PRINCIPALS & SPIECH GEORGIA

398.     Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, 249 through 298, 299 through 336, 337 through 360, 361 through 376, and 377 through 397 as though fully set forth herein.

399.     At all times relevant hereto, each of the Principals were officers, directors, members, or shareholders of Spiech Michigan and Spiech Georgia and in control of their business undertakings. *See Exhibits B, E, H,* and *I.*

400.     At all times relevant hereto, the Principals controlled and managed Spiech Michigan and Spiech Georgia's operations and financial dealings. *See Exhibits B, E, H,* and *I.*

401.     At all times relevant hereto, each of the Principals was in a position to control and manage Spiech Michigan and Spiech Georgia's operations and had the ability to control financial dealings. *See Exhibits B, E, H,* and *I.*

402.     At all times, Spiech Michigan and Spiech Georgia acted or failed to act through Principals.

403.     On information and belief, Defendants are in possession of monies rightfully belonging to Plaintiffs valued in excess of $2,220,831.68.

404.     Growers sold Produce to Spiech Michigan in the aggregate value of $1,288,398.31, which Spiech Michigan received and resold to third party purchasers as the Grower's grower's agent.

405.     The third party purchasers paid Spiech Michigan for all of the Growers' Produce. *See* Exhibit *FF* at 223:6-14.

406. Spiech Michigan failed to pay Growers for the Produce it received and resold, and the Growers remain unpaid.

407. Produce Pay consigned Produce to Spiech Michigan, which Spiech Michigan received and resold to third party purchasers on Produce Pay's behalf.

408. As a PACA licensee, dealer, and broker of Produce, Spiech Michigan received and resold said Produce on consignment on Produce Pay's behalf.

409. As a PACA licensee, consignment agent, and dealer or broker of Produce, Spiech Michigan collected or received funds for or on behalf of Produce Pay.

410. As a PACA licensee, consignment agent, and dealer or broker of Produce, Spiech Michigan possessed a duty to fully and promptly remit the proceeds of such Produce sold on consignment to Produce Pay.

411. As Produce Pay's consignment agent, Spiech Michigan and Principals invoiced and collected the proceeds of Produce Pay's Produce in the aggregate amount of $1,002,273.70.

412. Spiech Michigan failed to fully and promptly remit the proceeds of its sale of Produce Pay's produce.

413. At all times relevant hereto, Principals were each in a position to control or influence Spiech Michigan and Spiech Georgia's application and disposition of operating funds and otherwise had the power to influence the application of said funds, including the funds collected from its sale of Plaintiffs' Produce.

414. No just cause exists in law or equity for Defendants to receive or retain any portion of the funds Spiech Michigan withheld from Growers that they are owed under the contracts or the funds received from the sale of Produce Pay's Produce that Defendants failed to account for and remit.

415.     By continuing to convert and/or use the funds rightfully belonging to Plaintiffs for purposes other than paying Plaintiffs, including investment into Spiech Georgia and paying their own salaries, Defendants have been unjustly enriched to Plaintiffs' detriment.

416.     As a direct and proximate cause of the wrongful conversion of funds due to Plaintiffs, Plaintiffs have been damaged and Defendants have been unjustly enriched in an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

417.     Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

418.     As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

**COUNT XI**
**NEGLIGENCE**
**PRINCIPALS & SPIECH GEORGIA**

419.     The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, and 337 through 360 as though fully set forth herein.

420.     As a PACA licensee, and growers' agent, Defendants owed the Growers a duty to exercise reasonable care, good faith, and due diligence in marketing, selling, collecting the proceeds of Growers' Produce, and paying Growers promptly for the sale of their Produce.

421.     As a PACA licensee, and growers' agent, Defendants also owed Growers a duty to endeavor to sell Growers' Produce at a reasonable price.

422.    Defendants breached their duties to the Growers by negligently, wantonly, and recklessly failing to exercise reasonable care, good faith, and due diligence in marketing, selling, and collecting the Proceeds from the sale of Grower's Produce and ensuring prompt and full payment to Growers.

423.    Defendants further breached their duties of care to the Growers by negligently, wantonly, and recklessly failing to exercise reasonable care, good faith, and due diligence in endeavoring to sell Growers' Produce at a reasonable price. In fact, Defendants sold Grower's Produce at a price significantly lower than the going rate.

424.    As a PACA licensee and consignment agent, Defendants owed Produce Pay a duty to exercise reasonable care, good faith, and due diligence in selling, invoicing, collecting, and remitting payment for the sale of Produce Pay's Produce.

425.    Defendants breached their duties to Produce Pay by negligently, wantonly, and recklessly failing to exercise reasonable care, good faith, and due diligence to ensure prompt payment to Produce Pay for the sale of its Produce.

426.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

427.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

## COUNT XII
## COMMON ENTERPRISE LIABILITY
### SPIECH GEORGIA

428.    The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175 through 208, 209 through 248, 249 through 298, 299 through 336, 337

through 360, 361 through 376, 377 through 387, 398 through 418, and 419 through 427 as though fully set forth herein.

429.    Spiech Georgia is a wholly owned subsidiary of Spiech Michigan.

430.    Spiech Georgia and Spiech Michigan share the same members, officers, and directors. *See Exhibit E*.

431.    Spiech Georgia and Spiech Michigan's corporate funds are commingled, common bank and credit accounts are used to pay expenses of both entities, and funds are freely transferred between Spiech Michigan and Spiech Georgia. *See* Excerpt from Testimony of Tim Spiech, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 211:16 - 212:15, Jan. 4, 2018 attached hereto as *Exhibit II*.

432.    Spiech Georgia and Spiech Michigan use the same packaging, labeling, logo, and advertising in connection with sales of Produce by both entities.

433.    Products from either Spiech Georgia or Spiech Michigan are labeled as products of "Spiech Farms" and marketed together. *See* Excerpt from Testimony of Tim Spiech, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr. 194:15 – 196:23, Jan. 4, 2018 attached hereto as *Exhibit JJ*.

434.    The Principals, by and through Tim Spiech, admitted that the Produce sold from the Spiech Georgia farms were sold as a "brand of Spiech Farms." *See* Excerpt from Testimony of Tim Spiech, *In re: Spiech Farms, LLC*, 17-05398, Hr'g. Tr., 208:6 -211:8, Jan. 4, 2018 attached hereto as *Exhibit KK* at 210:6 - 20.

435.    Spiech Georgia and Spiech Michigan operate under the same PACA license for the sale of Produce from Georgia and Michigan. *See Exhibit KK*.

436. The same individuals have direction and management power, access to bank accounts, check signing power, and contracting authority for both Spiech Georgia and Spiech Michigan. *See Exhibits B, E, H, and I.*

437. Although Spiech Georgia and Spiech Michigan are separate limited liability companies and registered separately in their respective states, Principals make very little distinction between the two companies, and run them as two divisions of the same company. *See Exhibit E, and II through KK.*

438. Tim Spiech, Steve Spiech, and Robin Spiech hold themselves out to be Members of both companies, despite the fact that Spiech Georgia is a 100% wholly owned subsidiary of Spiech Michigan. *See Exhibits E and B.*

439. Tim Spiech acts as the President of both companies interchangeably. *See Exhibits E and B.*

440. Eve Stone acts as the Controller, and handles all financial dealings for both companies interchangeably. *See Exhibits E and H.*

441. All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals as one united entity in furtherance of the aims and interests of Spiech Georgia.

442. Spiech Georgia and Spiech Michigan share financial accounts including bank accounts and credit accounts, and pay business costs and expenses, salaries, rents, utilities, and other costs of operation for both Spiech Michigan and Spiech Georgia out of the same shared financial accounts.

443. Spiech Georgia and Spiech Michigan's business affairs are so intertwined that to absolve Spiech Georgia of liability to the Growers and Produce Pay would allow Spiech Michigan to defeat justice, perpetuate fraud, and to evade contractual or tort responsibility.

444. Spiech Georgia used the separate corporate identities of Spiech Michigan and Spiech Georgia as a subterfuge to divert assets, avoid paying debts, and defraud creditors such as Plaintiffs.

445. Spiech Georgia acted in concert with Spiech Michigan in order to divert funds that should have been used to pay Spiech Michigan's asparagus growers. Instead of using the funds from sales of asparagus to pay its growers, Principals funneled the funds into Spiech Georgia, where they were used to fund blueberry growing operations.

446. On information and belief, to effectuate this purpose, the Principals did not inform their bank in Michigan about Spiech Georgia after they planned the bankruptcy, so as to conceal that they were funneling the funds from Spiech Michigan to Spiech Georgia. *See Excerpt from Testimony of Tim Spiech, In re: Spiech Farms, LLC, 17-05398, Hr'g. Tr.*, p. 375-379 Jan. 4, 2018 attached hereto as *Exhibit LL* at 375:2-376:5.

447. As discussed above, there is a high interdependency of operations, commonality between management, directors and officers, and consolidation of financial, strategic, legal, and human resources operations between Spiech Michigan and Spiech Georgia.

448. The business operations of Spiech Michigan and Spiech Georgia are inextricably commingled, and are essentially two branches of the same entity operating in two different locations.

449. Therefore, Spiech Michigan and Spiech Georgia are operating as a common business enterprise, and Spiech Georgia is jointly and severally liable for Spiech Michigan's debts to Plaintiffs.

450. Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

451.   As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as Exhibit X.

## COUNT XIII
## PIERCING THE CORPORATE VEIL: ALTER-EGO LIABILITY
### (As to Defendant Tim Spiech)

452.   The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, 249 through 298, 299 through 336, 337 through 360, 361 through 376, 377 through 397, 398 through 418, and 419 through 427 as though fully set forth herein.

453.   As discussed above, at all relevant times herein, Tim Spiech, by his complete exercise of dominion and control over Spiech Michigan and Spiech Georgia along with the other Principals, is an alter ego of such entities. *See Exhibits B, E, G, and I.*

454.   Tim Spiech, the other Principals, Spiech Michigan, and Spiech Georgia combine to constitute a single enterprise, all under the discretion and control of Tim Spiech and the other Principals.

455.   Tim Spiech is a member, officer, and director of both Spiech Georgia and Spiech Michigan. *See Exhibits B, E, G, and I.*

456.   Tim Spiech disregarded the separate corporate identity of Spiech Georgia and Spiech Michigan when conducting their business affairs.

457.   Tim Spiech used Spiech Georgia merely as an instrumentality of his own affairs.

458.   Tim Spiech disregarded Spiech Georgia's corporate form so as to make it a mere sham or a business conduit for him and the other Plaintiffs to siphon assets away from Spiech

Michigan to Spiech Georgia and to hide assets from the bankruptcy estate and the creditors of Spiech Michigan, including Plaintiffs.

459.    Tim Spiech commingled and confused properties, records, and control of Spiech Michigan and Spiech Georgia on an interchangeable or joint basis.

460.    Tim Spiech has converted corporate property of Spiech Michigan.

461.    Tim Spiech has confused public knowledge and understanding of corporate control of Spiech Georgia and Spiech Michigan.

462.    All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals as one united entity in furtherance of the aims and interests of Spiech Georgia.

463.    Exceptional circumstances are presented in that Tim Spiech utilized the corporate structures of Spiech Georgia and Spiech Michigan to overextend and abused the corporate privilege to defeat justice, perpetuate fraud, and to evade contractual or tort responsibility.

464.    Tim Spiech and the other Principals used the separate corporate identities of Spiech Michigan and Spiech Georgia as a subterfuge to divert assets, avoid paying debts, and defraud creditors including Plaintiffs.

465.    Tim Spiech utilized Spiech Michigan to divert funds that should have been used to pay the Growers and Produce Pay. Instead of using the funds from sales of Produce to pay its Produce suppliers, Tim Spiech funneled the funds into Spiech Georgia, where they were used to fund blueberry growing operations and shield such funds and assets from creditors including the Plaintiffs.

466.    Allowing Tim Spiech and Spiech Michigan to have separate identities would promote injustice and protect fraud.

467.   Disregarding Tim Spiech and Spiech Michigan's separate corporate existence would remedy fraud and injustice.

468.   Tim Spiech is the alter ego of Spiech Michigan and Spiech Georgia, and is therefore liable for Spiech Michigan's debts to Plaintiffs.

469.   Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

470.   As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

### COUNT XIV
### ALTER EGO LIABILITY: PIERCING THE CORPORATE VEIL
### (As to Principal Robin Spiech)

471.   The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175 through 208, 209 through 248, 249 through 298, 299 through 336, 337 through 360, 361 through 376, 377 through 3977, 398 through 418, and 419 through 427 as though fully set forth herein.

472.   As discussed above, at all relevant times herein, Robin Spiech, by her complete exercise of dominion and control over Spiech Michigan and Spiech Georgia along with the other Principals, is an alter ego of such entities. *See Exhibits B, E, G,* and *I.*

473.   Robin Spiech, the other Principals, Spiech Michigan, and Spiech Georgia combine to constitute a single enterprise, all under the discretion and control of Robin Spiech and the other Principals.

474.   Robin Spiech is a member, officer, and director of both Spiech Georgia and Spiech Michigan. *See Exhibits B, E, G,* and *I.*

475.     Robin Spiech disregarded the separate corporate identity of Spiech Georgia and Spiech Michigan when conducting their business affairs.

476.     Robin Spiech used Spiech Michigan merely as an instrumentality of her own affairs.

477.     Robin Spiech disregarded Spiech Michigan's corporate form so as to make it a mere sham or a business conduit for her and the other Principals to siphon assets away from Spiech Michigan into Spiech Georgia and to hide assets from the bankruptcy estate and the creditors of Spiech Michigan, including Plaintiffs.

478.     Robin Spiech commingled and confused her personal properties, records, and control with that of Spiech Michigan and Spiech Georgia on an interchangeable or joint basis.

479.     Robin Spiech has converted corporate property of Spiech Georgia and Spiech Michigan.

480.     Robin Spiech has confused public knowledge and understanding of corporate control of Spiech Georgia and Spiech Michigan.

481.     All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals, the Principals including Robin Spiech, as one united entity in furtherance of the aims and interests of themselves and Spiech Georgia.

482.     Exceptional circumstances are presented that Robin Spiech has utilized the corporate structures of Spiech Georgia and Spiech Michigan to overextend and abused the corporate privilege to defeat justice, perpetuate fraud, and to evade contractual or tort responsibility.

483.     Principals, including Robin Spiech, used the separate corporate identities of Spiech Michigan and Spiech Georgia as a subterfuge to divert assets, avoid paying debts, and defraud creditors including Plaintiffs.

484.     Robin Spiech utilized Spiech Georgia to divert funds that should have been used to pay the Growers and Produce Pay. Instead of using the funds from sales of Produce to pay its Produce suppliers, Robin Spiech funneled the funds into Spiech Georgia, where they were used to fund blueberry growing operations and shield such funds and assets from creditors including the Plaintiffs.

485.     Allowing Robin Spiech and Spiech Michigan to have separate identities would promote injustice and protect fraud.

486.     Disregarding Robin Spiech and Spiech Michigan's separate corporate existence would remedy fraud and injustice.

487.     Robin Spiech is the alter ego of Spiech Michigan, and is therefore liable for Spiech Michigan's debts to Plaintiffs.

488.     Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

489.     As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

### COUNT XV
### ALTER EGO LIABILITY: PIERCING THE CORPORATE VEIL
### (As to Principal Steve Spiech)

490.     The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, 249 through 298, 299 through 336, 337

through 360, 361 through 376, 377 through 397, 398 through 418, and 419 through 427 as though fully set forth herein.

491.    As discussed above, at all relevant times herein, Steve Spiech, by his complete exercise of dominion and control over Spiech Michigan and Spiech Georgia along with the other Principals, is an alter ego of such entities. *See Exhibits B, E, G, and I.*

492.    Steve Spiech, the other Principals, Spiech Michigan, and Spiech Georgia combine to constitute a single enterprise, all under the discretion and control of Steve Spiech and the other Principals.

493.    Steve Spiech is a member, officer, and director of both Spiech Georgia and Spiech Michigan. *See Exhibits B, E, G, and I.*

494.    Steve Spiech disregarded the separate corporate identity between Spiech Georgia and Spiech Michigan when conducting his business affairs.

495.    Steve Spiech used Spiech Michigan merely as an instrumentality of his own affairs.

496.    Steve Spiech disregarded Spiech Michigan's corporate form so as to make it a mere sham or a business conduit for him and the other Principals to siphon assets away from Spiech Michigan into Spiech Georgia and hide assets from the creditors of Spiech Michigan, including Plaintiffs.

497.    Steve Spiech commingled and confused his personal properties including his real estate holdings within the state of Georgia, records, and control with that of Spiech Michigan and Spiech Georgia on an interchangeable and joint basis.

498.    Specifically, Steve Spiech utilized his personal real estate holding for the operations of both Spiech Georgia and Spiech Michigan.

499. Steve Spiech has converted corporate property of Spiech Michigan and invested it in Spiech Georgia to protect it from Spiech Michigan's creditors.

500. Steve Spiech has confused public knowledge and understanding of corporate control of Spiech Georgia and Spiech Michigan.

501. All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals, the Principals, including Steve Spiech, as one united entity in furtherance of the collective plan to throw Spiech Michigan into bankruptcy to avoid its debts and obligations to the Plaintiffs.

502. Exceptional circumstances are presented that Steve Spiech has utilized the corporate structures of Spiech Georgia and Spiech Michigan to overextend and abused the corporate privilege to defeat justice, perpetuate fraud, and to evade contractual or tort responsibility.

503. Principals, including Steve Spiech, used the separate corporate identities of Spiech Michigan and Spiech Georgia as a subterfuge to divert assets, avoid paying debts, and defraud creditors including Plaintiffs.

504. Steve Spiech utilized Spiech Michigan to divert funds that should have been used to pay the Plaintiffs to Spiech Georgia. Instead of using the funds from sales of Produce to pay its Produce suppliers, including the Plaintiffs, Steve Spiech funneled the funds to Spiech Georgia, where they were used to fund blueberry growing operations and shield such funds and assets from creditors including the Plaintiffs.

505. Allowing Steve Spiech and Spiech Michigan to have separate identities would promote injustice and protect fraud.

506.    Disregarding Steve Speich and Spiech Michigan's separate corporate existence would remedy fraud and injustice.

507.    Steve Spiech is the alter ego of Spiech Michigan and is therefore liable for Spiech Michigan's debts to Plaintiffs.

508.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

509.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X*.

**COUNT XVI**
**ALTER EGO LIABILITY: PIERCING THE CORPORATE VEIL**
**(As to Principal Bradley Spiech)**

510.    The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, 249 through 298, 299 through 336, 337 through 360, 361 through 376, 377 through 397, 398 through 418, and 419 through 427 as though fully set forth herein.

511.    As discussed above, at all relevant times herein, Bradley Spiech, by his complete exercise of dominion and control over Spiech Michigan and Spiech Georgia along with the other Principals, is an alter ego of such entities. *See Exhibits E, G, and I.*

512.    Bradley Spiech, the other Principals, Spiech Michigan, and Spiech Georgia combine to constitute a single enterprise, all under the discretion and control of Steve Spiech and the other Principals.

513.    Bradley Spiech is a member, officer, and director of both Spiech Georgia and Spiech Michigan. *See Exhibits E, G, and I.*

514. Bradley Spiech disregarded the separate corporate identity of Spiech Georgia and Spiech Michigan when conducting their business affairs.

515. Bradley Spiech used Spiech Michigan merely as an instrumentality of his own affairs.

516. Bradley Spiech disregarded Spiech Michigan's corporate form so as to make it a mere sham or a business conduit for him and the other Principals to siphon assets away from Spiech Michigan to Spiech Georgia and to hide assets from the bankruptcy estate and the creditors of Spiech Michigan, including Plaintiffs.

517. Bradley Spiech commingled and confused his personal properties, records, and control with that of Spiech Michigan and Spiech Georgia on an interchangeable or joint basis.

518. Bradley Spiech has converted corporate property of Spiech Georgia and Spiech Michigan.

519. Bradley Spiech has confused public knowledge and understanding of corporate control of Spiech Georgia and Spiech Michigan.

520. All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals, the Principals including Bradley Spiech, as one united entity in furtherance of the aims and interests of themselves and Spiech Georgia.

521. Exceptional circumstances are presented that Bradley Spiech has utilized the corporate structures of Spiech Georgia and Spiech Michigan to overextend and abused the corporate privilege to defeat justice, perpetuate fraud, and to evade contractual or tort responsibility.

522.    Principals, including Bradley Spiech, used the separate corporate identities of Spiech Michigan and Spiech Georgia as a subterfuge to divert assets, avoid paying debts, and defraud creditors including Plaintiffs.

523.    Bradley Spiech utilized Spiech Michigan to divert funds that should have been used to pay the Growers and Produce Pay. Instead of using the funds from sales of Produce to pay its Produce suppliers, Bradley Spiech funneled the funds into Spiech Georgia, where they were used to fund blueberry growing operations and shield such funds and assets from creditors including the Plaintiffs.

524.    Allowing Bradley Spiech and Spiech Michigan to have separate identities would promote injustice and protect fraud.

525.    Disregarding Bradley Spiech and Spiech Michigan's separate corporate existence would remedy fraud and injustice.

526.    Bradley Spiech is the alter ego of Spiech Michigan and is therefore liable for Spiech Michigan's debts to Plaintiffs.

527.    Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

528.    As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

### COUNT XVII
### PIERCING THE CORPORATE VEIL: ALTER EGO LIABILITY
### (As to Principal Eve Stone)

529.    The Plaintiffs re-allege paragraphs 1 through 24, 32 through 125, 126 through 142, 143 through 174, 175  through 208, 209 through 248, 249 through 298, 299 through 336, 337

through 360, 361 through 376, 377 through 397, 398 through 418, and 419 through 427 as though fully set forth herein.

530.    As discussed above, at all relevant times herein, Eve Stone, by her complete exercise of dominion and control over Spiech Michigan and Spiech Georgia along with the other Principals, is an alter ego of such entities. *See Exhibits E, H, and I.*

531.    Eve Stone, the other Principals, Spiech Michigan, and Spiech Georgia combine to constitute a single enterprise, all under the discretion and control of Eve Stone and the other Principals.

532.    Eve Stone is a member, officer, and director of both Spiech Georgia and Spiech Michigan. *See Exhibits E, H, and I*

533.    Eve Stone disregarded the separate corporate identity of Spiech Georgia and Spiech Michigan when conducting their business affairs.

534.    Eve Stone used Spiech Georgia merely as an instrumentality of her own affairs.

535.    Eve Stone disregarded Spiech Georgia's corporate form so as to make it a mere sham or a business conduit for her and the other Principals to siphon assets away from Spiech Michigan to Spiech Georgia and to hide assets from the bankruptcy estate and the creditors of Spiech Michigan, including Plaintiffs.

536.    Eve Stone commingled and confused her personal properties, records, and control with that of Spiech Michigan and Spiech Georgia on an interchangeable or joint basis.

537.    Eve Stone has converted corporate property of Spiech Georgia and Spiech Michigan.

538.    Eve Stone has confused public knowledge and understanding of corporate control of Spiech Georgia and Spiech Michigan.

539.   All major decisions for Spiech Georgia and Spiech Michigan were made by the same individuals, the Principals, including Eve Stone, as one united entity in furtherance of the aims and interests of themselves and Spiech Georgia.

540.   Exceptional circumstances are presented that Eve Stone has utilized the corporate structures of Spiech Georgia and Spiech Michigan to overextend and abused the corporate privilege to defeat justice, perpetuate fraud, and to evade contractual or tort responsibility.

541.   Principals, including Eve Stone, used the separate corporate identities of Spiech Michigan and Spiech Georgia as a subterfuge to divert assets, avoid paying debts, and defraud creditors including Plaintiffs.

542.   Eve Stone utilized Spiech Michigan to divert funds that should have been used to pay the Growers and Produce Pay. Instead of using the funds from sales of the Produce to pay its Produce suppliers, the Principals and Spiech Michigan funneled the funds into Spiech Georgia, where they were used to fund blueberry growing operations and shield such funds and assets from creditors including the Plaintiffs.

543.   Allowing Eve Stone and Spiech Michigan to have separate identities would promote injustice and protect fraud.

544.   Disregarding Eve Stone and Spiech Michigan's separate corporate existence would remedy fraud and injustice.

545.   Eve Stone is the alter ego of Spiech Michigan, and is therefore liable for Spiech Michigan's debts to Plaintiffs.

546.   Defendants currently owe Plaintiffs an amount not less than $2,220,831.68, plus further interest and all costs of collection, including attorneys' fees.

547. As a direct result of the Defendants' aforementioned actions and inactions, the Growers and Produce Pay have each incurred damages in the specific amounts set forth in the Damages Chart attached hereto as *Exhibit X.*

WHEREFORE, the Plaintiffs respectfully seeks the entry of an Order providing as follows:

A) As to Count I, entering a Final Judgment in favor of Plaintiffs and against Principals, jointly and severally, for violation of section 2 of PACA for failing to fully and promptly pay Plaintiffs in connection with Produce transactions;

B) As to Count II, entering a Final Judgment in favor of Plaintiffs and against the Principals, jointly and severally, for violation of section 2 of PACA for making false or misleading statements in connection with Produce transactions;

C) As to Count III, entering a Final Judgment in favor of Plaintiffs and against Principals, jointly and severally, for violation of section 2 of PACA for breach of their obligations of good faith and fair dealing in connection with Produce transactions;

D) As to Count IV, entering a Final Judgment in favor of Plaintiffs and against Principals, jointly and severally, for violation of section 2 of PACA for breach of their express or implied duties in connection with Produce transactions;

E) As to Count V, entering a Final Judgment in favor of Plaintiffs and against the Defendants, jointly and severally, for conspiracy to defraud Plaintiffs;

F) As to Count VI, entering a Final Judgment in favor of Plaintiffs and against Defendants, jointly and severally, for fraud;

G) As to count VII, entering a Final Judgment in favor of Plaintiffs and against Defendants, jointly and severally, for breach of their fiduciary duties to corporate creditors.

H)    As to Count VIII, entering a Final Judgment in favor of Plaintiffs and against Defendants, jointly and severally, for tortious interference with contract;

I)    As to Count IX, entering a Final Judgment in favor of Plaintiffs and against Defendants, jointly and severally, for conversion;

J)    As to Count X, entering a Final Judgment in favor of Plaintiffs, and against Defendants, jointly and severally, for unjust enrichment.

K)    As to Count XI, entering a Final Judgment in favor of Plaintiffs, and against Defendants, jointly and severally, for negligence.

L)    As to Count XII, entering a Final Judgment in favor of Plaintiffs and against Spiech Georgia for common enterprise liability;

M)    As to Count XIII, entering a Final Judgment in favor of Plaintiffs and against Tim Spiech for alter ego liability;

N)    As to Count XIV, entering a Final Judgment in favor of Plaintiffs and against Robin Spiech for alter ego liability;

O)    As to Count XV, entering a Final Judgment in favor of Plaintiffs and against Steve Spiech for alter ego liability;

P)    As to Count XVI, entering a Final Judgment in favor of Plaintiffs and against Bradley Spiech for alter ego liability;

Q)    As to Count XIV, entering a Final Judgment in favor of Plaintiffs and against Eve Stone for alter ego liability;

R)    Awarding Plaintiffs damages incurred as a result of Defendant's actions and inactions in the amount of $2,220,831.68, plus prejudgment interest and contractually due costs of

collection, including reasonable attorneys' fees, incurred in this action, in the specific individual amounts set forth in *Exhibit X*;

S)      And awarding further relief as this Honorable Court deems just and appropriate upon consideration of this matter.

Dated: January 9, 2019                          Respectfully submitted,


/s/ Mark A. Gilbert

Mark A. Gilbert
COLEMAN TALLEY, LLP
109 South Ashley Street
Valdosta, GA 31601
Tel: (229) 242-7562
Fax: (229) 333-0885
Email: mark.gilbert@colemantalley.com

*Local Counsel for Plaintiffs*

-AND-

By: /s/ Jason R. Klinowski

Jason R. Klinowski, Esq.
*Pro hac vice application forthcoming*
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
800 Shades Creek Parkway
Suite 400
Birmingham, Alabama 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
jklinowski@wallacejordan.com

*Lead Counsel for Plaintiffs*